(No. 61915.—
THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DENNIS EMERSON, Appellant.

*Opinion filed December 30, 1987.—Rehearing denied April 5, 1988.*

412

414

416

WARD, J., CLARK, C.J., and SIMON, J., dissenting.

Theodore A. Gottfried, State Appellate Defender, Charles M. Schiedel, Deputy Defender, and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., Kevin Sweeney and David A. Cuomo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Dennis Emerson, was convicted in a jury trial in the circuit court of Cook County of one count each of murder, attempted murder, and aggravated arson and of two counts of armed robbery. The same jury imposed the death sentence for the murder conviction. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, sec. 4(b); 107 Ill. 2d Rules 603, 609(a).

This is the second time the defendant has been convicted of the offenses here and sentenced to death; in an earlier appeal, the court reversed the defendant's convictions and granted him a new trial (*People v. Emerson* (1983), 97 Ill. 2d 487). The defendant's retrial was conducted in March 1985. The main evidence against the defendant was provided by Robert Ray, co-owner and operator of the Centaur Lounge, located at 1154 West 69th Street in Chicago. Ray testified that he was working at his lounge around noon on Sunday, August 12, 1979, when he received a telephone call from the defendant, who said that he was going to stop by later that day; Ray had known the defendant for several years. The

defendant called again later that afternoon, saying that he had been delayed but that he would still come by. Ray closed the lounge at about 1:15 the following morning, and the defendant called around that time and said that he was on his way over. The defendant soon arrived with one of his brothers, Richard Jackson, and the three sat and talked in Ray's apartment, which was connected to the lounge and was located at the back of the building. Ray's girlfriend, Delinda Byrd, appeared some time later, and Ray introduced her to the others. Ray then left briefly to buy cigarettes at a store across the street—the vending machine in the Centaur Lounge was out of his brand. Ray returned to the apartment and rejoined the others.

Ray testified that as he was opening his pack of cigarettes the defendant stood up, pulled out a gun, and ordered him and Byrd to lie on the floor. The defendant then bound their hands and feet with electrical cords that he pulled from lamps in the apartment and tavern. The defendant took Ray's keys and opened the cash register; Ray also told the defendant where his guns and jewelry were hidden, and the defendant found those items. The defendant searched Ray and Byrd and found on Byrd $600, which, according to Ray, she had planned to use in renting a new apartment. While this was going on, Richard Jackson kept a gun trained on Ray and Byrd, who were lying on the floor.

The defendant and Jackson then went into the kitchen of the apartment, and Jackson told the defendant to "use this," picking up a half pair of scissors or shears lying on Ray's desk. The defendant straddled Ray, lifted Ray's shoulder, and stabbed him two times in the chest with the blade. The defendant then went over to where Byrd was lying and stabbed her a number of times in the back. Following that, the defendant started a fire in the bedroom, and the defendant and Jackson

threw Ray and Byrd into the burning room and shut the door. Ray testified that he heard the door knob being rattled and that he lay still until the noise died. He then untied his hands, hopped over to the bedroom window and raised it, and fell out into the airshaft between his building and the building next door, a drop of about eight feet.

Ray testified that Byrd also managed to get out of the bedroom and into the airshaft, and there he untied the rest of the bindings. Ray then climbed back into the bedroom and tried to open the door, but he found that it had been secured shut. Ray jumped back into the airshaft and opened the kitchen window, but the kitchen was engulfed with smoke and fire. Finally, Ray tried to get into a window that had an air conditioner in it. He stood on top of the air conditioner, kicked out the plasterboard surrounding it, and fell into the lounge. Ray ran out the front door and asked someone to call the fire department. Ray then went to the back of the building, where he was able to see Byrd through a narrow gap separating his building from the one next door.

Firefighters were unable to rescue Delinda Byrd from the airshaft, and her body was found there after the fire was extinguished. Medical testimony established that Byrd had been stabbed five times in her back, and she also had second-degree and third-degree burns over 90% of her body. The cause of her death was attributed to loss of blood from the stab wounds; the extensive burns were a contributing cause.

Following the fire, lengths of electrical cord were found in the bedroom of the apartment. The bedroom door was consumed in the fire, but a door knob and door lock assembly were found on the floor, and a coat hanger was next to them. No scissors or shears were found in the wreckage. Debris taken from the fire scene was

tested for the presence of flammable hydrocarbons, and the results were negative.

Exculpatory evidence was provided by codefendant Richard Jackson, who was the defendant's brother. Jackson implicated himself in the offenses, and he gave a description of events that largely paralleled Ray's testimony, with the exception that a man named Phillip Anderson, and not the defendant, was the person with Jackson at Ray's lounge. Jackson said that on August 12, 1979, he called the defendant to ask to borrow several hundred dollars. According to Jackson, the defendant said that the money could be obtained from Robert Ray, to whom the defendant had made a loan. The defendant then called Ray and said that his brother would be coming over. Jackson testified that he later went to Ray's lounge with a friend, Phillip Anderson. There, Jackson asked Ray for $300, but Ray would give him only $50. According to Jackson, Anderson then drew a gun, and when Delinda Byrd arrived, she and Ray were tied up. Jackson testified that Anderson stabbed Ray and Byrd and set the bedroom on fire; Anderson and Jackson then threw the two into the room. On cross-examination, Jackson conceded that he had not previously told this version of events to anyone.

The jury returned verdicts finding the defendant guilty of murder, attempted murder, armed robbery, and aggravated arson. A bifurcated sentencing hearing was then held. The parties stipulated that the defendant was born in 1951 and therefore was 18 years or older at the time of the offenses here. The jury found the defendant eligible for the death penalty because of his commission of the murder during the course of another felony, armed robbery. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).) At the second part of the penalty hearing, the State presented certified copies of the defendant's convictions for various State and Federal offenses. That evi-

dence showed that the defendant pleaded guilty to a number of armed robbery charges in Cook County circuit court in September 1971 and was sentenced to concurrent, indeterminate terms of four to eight years' imprisonment. In 1975, in a Federal prosecution, the defendant pleaded guilty to charges of receiving and possessing stolen bank notes and unlawful use of a weapon, and he was sentenced to an aggregate sentence of five years' imprisonment. In 1976 the defendant pleaded guilty in the circuit court of Cook County to a charge of armed robbery and was sentenced to an indeterminate term of five to eight years' imprisonment, to be served concurrently with the Federal sentence; the defendant was paroled from prison on July 24, 1979, several weeks before the offenses in this case were committed. No evidence in mitigation was presented, and the defendant was sentenced to death for his murder conviction.

I

The defendant first argues that the trial judge erred in denying his motion for automatic substitution of judge. Judge Bailey presided at the defendant's first trial, and following this court's remand the case was returned to Judge Bailey's trial call on December 7, 1983. That day the defendant told the judge that he was going to file a motion for automatic substitution of judge, and he did so a week later, on December 14. Judge Bailey denied the motion, ruling that the motion was untimely because the case was not a new one but rather had been on his call for a long time.

The defendant's motion for substitution of judge was made under section 114—5(a) of the Code of Criminal Procedure of 1963, which provides:

"Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitu-

tion of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." Ill. Rev. Stat. 1979, ch. 38, par. 114—5(a).

The defendant argues that the cause on remand was a new proceeding for purposes of section 114—5(a). In support of that argument, the defendant correctly observes ·that in several cases similar to this the court has entered nonprecedential, supervisory orders (see Ill. Const. 1970, art. VI, sec. 16) directing trial judges to grant motions for automatic substitution. The defendant also relies on *People v. McWilliams* (1932), 350 Ill. 628, which considered a similar factual situation under an earlier statute.

In *McWilliams* the defendant had pleaded guilty to a charge of murder and had been sentenced to death; following this court's decision in an earlier appeal reversing the death sentence, the defendant filed a petition in the circuit court for a change of venue, as the automatic substitution provision was then called. In the petition, the defendant alleged "that he feared he would not receive a fair trial; that the presiding judge, at the October, 1931, term of the circuit court, heard the testimony of witnesses and sentenced him to death; that the Supreme Court reversed the judgment; that the cause was redocketed and that by reason of these facts, the presiding judge was prejudiced against him." (*People v. McWilliams* (1932), 350 Ill. 628, 630.) The circuit judge denied the petition and, in resentencing the defendant, again imposed the death penalty. On appeal, the defendant argued that the trial judge erred in denying his petition for

change of venue. The State contended, however, that the defendant's petition was untimely. The State relied on section 25 of the Act, which prohibited a change of venue after the first term at which the request might have been made, unless the petitioner could show that the cause for which the petition was being brought had arisen or come to light since that time. This court rejected the State's argument, ruling that the defendant's request was timely. The court believed that "[t]he facts upon which the application was based arose largely after the reversal of the circuit court's first judgment and the remandment of the cause to that court" and therefore concluded that "[t]he application, based upon the facts alleged in the petition, could not have been made at an earlier term of the circuit court." (*People v. McWilliams* (1932), 350 Ill. 628, 633.) Therefore, the court concluded that the trial judge should have granted the petition.

The current substitution-of-judge statute is different in several important respects from the provisions in effect when *McWilliams* was decided. (See Ill. Rev. Stat. 1931, ch. 146, pars. 18 through 35.) At that time, as the court's discussion indicates, a defendant and his attorney were required to submit supporting affidavits, and under the statute then in effect, all petitions for change of venue were termed "for cause." Moreover, there was no absolute time limit on filing the petition; section 25 provided, "No change of venue shall be granted after the first term at which the applicant might have been heard, unless he shall show that the causes for which a change is asked have arisen or come to this knowledge since the term at which the application might have been made." (Ill. Rev. Stat. 1931, ch. 146, par. 25.) In holding for the defendant in *McWilliams*, then, the court construed the petition for change of venue filed by the defendant following remand as resting on information that could not have been raised earlier. In contrast, the statute in ef-

fect at the time of trial in this case contained both a provision allowing the automatic substitution of judge, section 114—5(a), under which the defendant's motion was filed, and a provision allowing a motion for cause, section 114—5(c). (Ill. Rev. Stat. 1979, ch. 38, pars. 114—5(a), (c) (current provisions at Ill. Rev. Stat., 1986 Supp., ch. 38, pars. 114—5(a), (d)).) A motion for automatic substitution under section 114—5(a) must be made within 10 days of the time the cause is put on the trial judge's call; motions for cause are not similarly limited. In light of the differences between the current provisions and those considered in *McWilliams*, we believe that *McWilliams* affords scant support for the defendant's argument here.

We must still determine whether section 114—5(a) required the granting of the defendant's motion in this case. Here, Judge Bailey presided at the defendant's first trial, and on remand the case was assigned to him again. Also, the case was tried under the same indictment as before. (*Cf. People v. Smith* (1963), 28 Ill. 2d 445 (defendant held entitled to automatic substitution on remand; new indictment obtained against him on remand).) This court has held that a request under section 114—5(a) for automatic substitution of judge must also be made before the trial judge rules on a substantive matter in the case. (See *People v. Norcutt* (1970), 44 Ill. 2d 256, 262-63; *People v. Speck* (1968), 41 Ill. 2d 177, 187, *modified* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2276.) Therefore, the motion may not be made in response to an adverse ruling on an issue. With that in mind, we believe that the appropriate interpretation of section 114—5(a) is to construe the remand here as a continuation of the original proceedings, for purposes of this statutory provision. (See *People v. Wolfe* (1970), 124 Ill. App. 2d 349, 353-54.) In light of our conclusion that the trial judge did not err in denying the defendant's motion for automatic substitution of judge, we need not

consider the related argument that counsel's failure to specify the issue as a ground for relief in the post-trial motion constituted ineffective assistance of counsel.

## II

The defendant next argues that the trial judge erred in failing to question the venire more thoroughly with respect to their attitudes concerning the presumption of innocence. During *voir dire*, defense counsel requested that the trial judge ask the prospective jurors whether they understood that an accused is presumed to be innocent and whether they had any objection to that principle. The trial judge declined to ask those questions, stating that he had sufficiently covered the subject in remarks he had made earlier to the venire as a whole. The defendant contends that under *People v. Zehr* (1984), 103 Ill. 2d 472, the trial judge was required to ask the proposed questions concerning the presumption of innocence. *Zehr* is applicable here, for the defendant's trial occurred after the decision in that case. See *People v. Britz* (1986), 112 Ill. 2d 314, 318-19.

In *Zehr*, defense counsel requested that prospective jurors be asked whether they would have any hesitation in returning a not-guilty verdict if the State failed to prove the defendant's guilt beyond a reasonable doubt, whether they would view the defendant with disfavor if he did not testify, and whether they understood that an accused is presumed innocent and need not present any evidence in his own behalf but rather must be proved guilty beyond a reasonable doubt by the State. The trial judge declined to ask those questions, and on appeal this court held that the requested inquiry should have been made. The court believed that a jury instruction at the end of trial would have "little curative effect" if a juror were prejudiced against one of those basic guarantees. *People v. Zehr* (1984), 103 Ill. 2d 472, 477.

The State contends that the trial judge here fulfilled the *Zehr* requirement with respect to the presumption of innocence by remarks he made at the outset of *voir dire*. The trial judge initially told the prospective jurors that they would be required to follow the law as he instructed them on it and asked the jurors whether they would be able to do that. The trial judge said:

> "So, I'm sure if you follow the instructions, you'll have no problem at all. But when I tell you the law is a particular way, that's the way it is.
>
> As I tell all jurors, I am the boss of the law. So, considering that, is there any juror, including the jurors that are out there that will not follow the law as I give it to them? Anybody? When I tell you the law is a particular way, that's the law you must follow.
>
> Will everybody do it? Are you absolutely sure? You might—everybody said yes. I want you to remember that."

Later, the trial judge told the prospective jurors:

> "There's one thing I forgot to mention to you before and that is that as the Defendant sits in court at the present time, he is presumed innocent. This in a sense will remain with him throughout the case until or if the State proves him guilty beyond a reasonable doubt. So, if I were to take the first twelve whose names I first called out, told you to go back to the jury room, give me a verdict at this time, I'm sure all twelve of you would look at me and say what's that man talking about. How could we possibly go ahead and give a verdict at this time since we haven't heard anything. It would be absolutely wrong because if I asked you to give me a verdict at this time, your verdict would have to be not guilty since you have not heard anything.
>
> Until the State proves him guilty beyond a reasonable doubt, he is not guilty, do you understand? It goes to the fundamental aspect of our law in the United States."

*Zehr* did not attempt to prescribe a precise formula for trial judges to use in ascertaining jurors' prejudices

or attitudes, and we believe that the purpose expressed in *Zehr* was satisfied here by the trial judge's general admonition coupled with his subsequent discussion of the presumption of innocence. In this case the trial judge first told the jurors that they would be expected to follow the jury instructions, and he asked whether they would be able to do that. Later, the trial judge told the jurors that the defendant was presumed innocent until the State proved his guilt beyond a reasonable doubt. To demonstrate the meaning of that principle, the trial judge posited a hypothetical jury that was asked to determine the defendant's guilt or innocence before the State presented any evidence; in that event, the trial judge explained, the jury would have to return a not-guilty verdict. On this record, we conclude that the trial judge sufficiently complied with *Zehr*.

## III

The defendant also argues that he was denied the effective assistance of counsel because of a number of errors allegedly committed by trial counsel. To obtain a new trial or sentencing hearing on grounds of ineffective assistance, a defendant must show both a deficiency in counsel's performance and prejudice resulting from that. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) To establish actual prejudice resulting from an alleged deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) In this regard, the defendant makes a broad attack on

counsel's performance at trial. For the reasons set out below, we do not believe that the defendant was prejudiced by the errors complained of, taken individually or cumulatively.

First, the defendant contends that defense counsel presented a futile strategy at trial and, in his closing argument, conceded the defendant's guilt for the murder charge. In closing argument at trial, counsel told the jurors:

> "Ladies and gentlemen, this case has become bizarre, in and out. A state of confusion during this trial as I suppose you can tell due to the fact that my client and I have disagreement—disagreements about how the case should be tried. And, of course, as you heard, the testimony of his brother that you heard a few moments ago was something that no one heard, including myself and his [*i.e.*, Jackson's] own lawyer until the time he took the stand and gave it. But as long as this man's life is in my hands, I'm going to do my best to save his life.
>
> I can still look you in the eye with all this evidence and say this. That I don't believe that two people went into that place that night with the idea to commit an armed robbery. And there's a difference between just a simple murder and felony murder. I know it sounds terrible, but in our law, there's a difference between when a man commits murder and when a man commits murder in the course of a felony.
>
> * * *
>
> If you have any doubts about the counts of armed robbery which will be submitted to you in this case with respect to Dennis Emerson, please, at this point, find him not guilty of armed robbery. It does make a difference. And as I say, I don't think that two men planning to go into a saloon, a tavern in this particular area and planning to commit a robbery, planning to take the weekend proceeds—
>
> MR. BRADY [an assistant State's attorney]: I'm going to object at this point. Whether they planned it or not is not relevant. The fact they did it or not is relevant.

THE COURT: Overruled. I'll instruct the jury as to the law.

MR. SAMMONS [defense counsel]: In planning to murder the witnesses so there would be no witnesses to it, you never call up and announce their arrival. Would never allow this man to leave, go out and get cigarettes. That's all I'm saying. If this was a murder, it was a murder. If there is a reasonable doubt that this was a murder committed in the course of a forcible felony of armed robbery, I'm asking you to so indicate by signing verdict forms of not guilty with respect to these armed robbery counts. And that's all I'm asking you. Thank you."

The defendant contends that counsel's closing argument effectively conceded the defendant's guilt for the offense of murder. The defendant fears that the jurors may have construed counsel's statement, "I can still look you in the eye with all this evidence and say this. That I don't believe that two people went into that place that night with the idea to commit an armed robbery," as suggesting that counsel was unable to say that he did not believe that the defendant was guilty of murder. The defendant also fears that the jurors may have construed counsel's statement at the end of the argument, that "all" he was asking the jurors to do was to acquit the defendant of the armed robbery counts, to mean that counsel was conceding the defendant's guilt for the other offenses here, including the murder charge. The defendant contends that a new trial is warranted under *People v. Hattery* (1985), 109 Ill. 2d 449.

In *Hattery*, the defendant was convicted of murdering a mother and her two children and was sentenced to death for those offenses. The evidence in that case showed that the defendant stood guard over the victims while a codefendant was with the woman's husband trying to obtain drugs. The defendant confessed to committing the murders, and in his statement he explained that the codefendant instructed him to kill the victims if the

drug search lasted more than a specified period of time; the defendant also said that the codefendant threatened to harm the defendant and his family if he disobeyed those orders. In the opening statement at trial, defense counsel told the jury that the defendant was indeed guilty of the murders and, furthermore, was eligible for the death penalty; counsel said that the only question in the case was whether the death sentence should be imposed. Defense counsel did not advance any theory of innocence at trial, did not present any evidence, and did not make a closing argument. Rather, counsel attempted to show, in cross-examination, that the defendant's actions were the product of compulsion, which is not a defense to a charge of murder but it may be sufficient to preclude imposition of the death penalty. Applying the standard set out in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the court in *Hattery* concluded that the defendant was denied the effective assistance of counsel. Because the defendant in that case had pleaded not guilty to the offenses, the court believed that the defense strategy was an impermissible one in the absence of a record showing of the defendant's consent to it.

There are several significant distinctions between this case and what occurred in *Hattery*. Although here the focus of defense counsel's closing argument was on the armed robbery charges—a separate issue that will be considered later—we do not interpret counsel's statement as constituting a direct, unequivocal concession of the defendant's guilt of the primary charge against him, such as that condemned in *Hattery* (see 109 Ill. 2d 449, 464). Moreover, contrary to the defendant's interpretation, defense counsel in this case did attempt to develop a theory of innocence at trial. In cross-examining various witnesses, including Robert Ray, defense counsel attempted to show that Ray himself was responsible for

Byrd's death. Counsel elicited from Ray the information that he and Byrd sometimes argued and that he did not try to stop the flow of blood from Byrd's stab wounds.

That theory was undermined, however, by the testimony of Richard Jackson, who was called as a witness at the defendant's insistence. Jackson corroborated Ray's account of events, except with respect to the identity of the accomplice. Thus, Jackson's testimony was not consistent with the theory of defense that counsel had attempted to present earlier. In closing argument, then, counsel was faced with the difficulty of presenting to the jurors two alternative theories of the case, one that he had developed, and one that had gone forward at the defendant's own insistence. Although the theory expressed by counsel in his argument was not consistent with this court's statement in *People v. Walker* (1982), 91 Ill. 2d 502, 511, that the death penalty statute "does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony," we do not believe that the error prejudiced the defendant. The evidence of the defendant's guilt for the offenses was overwhelming, and the jury was instructed on the proper role of closing argument.

The defendant also contends that defense counsel failed to maintain proper control over the proceedings at trial and made only a perfunctory and inadequate examination of one defense witness and no examination of another. The witnesses in question were Mrs. Jackson, the defendant's mother, and Rickey Jackson, who was the brother of both Richard Jackson and the defendant.

Defense counsel had not planned on presenting any evidence at trial, but Mrs. Jackson and Rickey Jackson were called at the defendant's insistence. The defendant himself attempted to examine Rickey Jackson; the defendant's questioning was unsuccessful, however, and

counsel then took over. Rickey Jackson testified that he worked for Robert Ray at the Centaur Lounge from 1977 until the summer of 1979. Sometime after the fire Rickey asked Ray about it, and Ray said that Rickey's brothers were responsible. Counsel then attempted to elicit from Rickey testimony concerning ill-will between Ray and the defendant over a loan that the defendant apparently made to Ray. The trial judge sustained the State's objections to that line of inquiry; the defendant has not contested that ruling on appeal here. In the case of Mrs. Jackson, defense counsel did not ask any questions of the witness, believing that the defendant himself would conduct the examination. The defendant chose to absent himself from the proceedings on that occasion, however, and the witness was then excused without having been asked any questions. We do not believe that the defendant can now complain of counsel's efforts. The defendant does not contend here that Rickey Jackson's testimony would have been admissible. Moreover, the problem with Mrs. Jackson arose because of the apparent misunderstanding over who would conduct the questioning. In view of these circumstances, we do not believe that counsel's handling of the matters was erroneous or prejudicial.

The defendant would also fault defense counsel's cross-examination of one of the State's witnesses, James Griffin, who was one of the investigating officers at the fire scene. Defense counsel asked Officer Griffin the question, "Did Mr. Ray ever tell you at the scene that he was beaten by the offenders in this case?" Griffin replied, "Yes, sir, he did." Defense counsel did not ask the witness any other questions on cross-examination. The defendant argues that defense counsel's question of Officer Griffin was purposeless and could only have resulted in prejudice. We do not agree. Robert Ray had testified that the defendant struck him once or twice, but he did

not describe those blows as a beating. Thus, the answer given by Griffin to counsel's question could have been construed as contradicting Ray's testimony.

The defendant also argues that defense counsel was ineffective for making no attempt to conceal from the jury disputes that arose between him and the defendant during trial. The defendant complains of two instances in which counsel expressed his exasperation with the defendant. The first occurred when the defendant's mother, Mrs. Jackson, was called to the stand to testify. Mrs. Jackson was not asked any questions, and when she was excused, counsel explained to the judge, "I didn't ask to call this lady." The trial judge then asked the defendant whether he wished to confer with counsel, and defense counsel interjected the comment, "I have conferred all I want to, Judge." The defendant also complains of a comment counsel made in closing argument at trial, when counsel said, "Ladies and gentlemen, this case has become bizarre, in and out. A state of confusion during this trial as I suppose you can tell due to the fact that my client and I have disagreement—disagreements about how the case should be tried." The defendant contends that counsel's remarks could only have served to prejudice his case in the eyes of the jury. We believe that although counsel could have been more circumspect in venting his evident frustration, the two brief, isolated comments cited by the defendant could not have resulted in prejudice.

## IV

The defendant next argues that certain comments made by the State in closing argument denied him a fair trial. The defendant complains that the prosecutors improperly vouched for the credibility of their witnesses and improperly expressed their personal opinions regarding the defendant's case. These objections are belated;

defense counsel failed to preserve these matters for review, for he neither objected to those parts of the argument nor raised the point in his post-trial motion. But because the defendant also argues that the procedural default would constitute ineffective assistance of counsel, we shall examine the question on its merits.

Generally, it is improper to vouch for the credibility of a witness or to express a personal opinion on a case. (*People v. Johnson* (1986), 114 Ill. 2d 170, 198; *People v. Hoffman* (1948), 399 Ill. 57, 64-66; see *United States v. Young* (1985), 470 U.S. 1, 84 L. Ed. 2d 1, 105 S. Ct. 1038.) Comments on the strength of the evidence are permitted, however. (*People v. Yates* (1983), 98 Ill. 2d 502, 532; *People v. Tiller* (1982), 94 Ill. 2d 303, 319.) We believe that the remarks complained of here, set out below, were either fair comments on the evidence or, viewed in context, did not amount to personal opinions regarding the strength of the State's case.

The defendant first complains of the comment, "We know Robert Ray was telling you the truth." After describing the condition of the building following the fire and the point of origin of the fire, the prosecutor said:

> "*And we know Robert Ray was telling you the truth.* We could tell. You tell by the way the man told you what happened that he was telling you the truth." (Emphasis added.)

With this remark the prosecutor evidently sought to emphasize the favorable impression created by the Robert Ray's demeanor during his testimony. The prosecutor's remark correctly foreshadowed the jury instruction on the credibility of witnesses. "In considering the testimony of any witness, you may take into account *** his manner while testifying ***." Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981).

The defendant makes a similar objection to a later remark by the prosecutor. At that time the prosecutor said:

"The decision in this case, ladies and gentlemen, should not be terribly difficult. *We know that Robert Ray was telling you the truth about what happened because we heard another witness in this case.* A witness that this cold evil man who sits over there brought to the witness stand. [A] [m]an that would have you believe that everything Robert Ray told you was absolutely the truth except for one thing. That it was not him. It was Richard all right, but it was some other guy with Richard." (Emphasis added.)

Viewed in context, the prosecutor's remark, "We know that Robert Ray was telling you the truth," was a fair comment on the evidence. As the prosecutor went on to explain, Ray's testimony was corroborated by that of a defense witness, Richard Jackson, in all respects but one—the identity of the other person who was with Jackson.

The defendant also complains of a comment by the prosecutor that came during a description of the duties and responsibilities of the various participants in the criminal justice system. The prosecutor said:

"Ladies and gentlemen, everybody in this courtroom has responsibilities. Most of us at least try to live up to them. *We have a responsibility, Dane and I, to present this case to you to seek justice.* Defense has a responsibility to see that their clients get a fair trial. The Judge has a responsibility." (Emphasis added.)

Counsel went on to refer to the trial judge's duty of determining issues of law and to the jury's duty of deciding disputed questions of fact. We do not agree with the defendant that the jury would have interpreted the remark complained of as a guarantee by the State of the accuracy or integrity of its case. In light of the references to defense counsel, judge, and jury, the jurors here

would have correctly understood the remark as one pertaining to the prosecution's function in the criminal justice system.

Finally, the defendant complains of a remark made in rebuttal argument. On that occasion the prosecutor said:

> "It makes absolutely no sense that Richard would have first told this story some six years, six years after this crime. Not to any other lawyer, not to even his own lawyer did he tell that story. First time he told it was when he was telling you when he is trying to get his brother off. He's trying to take the weight himself and some some [*sic*] unknown party never heard of before. *We have no idea who these—this guy is, Phillip Anderson. He probably doesn't really exist.* Just a name he came up with so he could try to take some of the weight off his brother. And it's a ridiculous story." (Emphasis added.)

This also was a fair comment on the evidence. Richard Jackson conceded that he had not previously told anyone the version of events that he related at trial; from that the trier of fact could infer that Jackson was lying, that his testimony was a convenient fiction, and that the person whom Jackson implicated, Phillip Anderson, did not really exist. The comment was therefore a reasonable inference from the evidence.

## V

The defendant makes a number of arguments that pertain to his death sentence and the sentencing hearing. The defendant argues that the trial judge's removal of a juror because of his opposition to capital punishment was erroneous under the principle expressed in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and later refined and clarified in *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, and *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844. The defendant con-

tends that he is therefore entitled to a new sentencing hearing. See *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21 (error in removal of juror affects death sentence only and not convictions).

The defendant contends that the removal of the juror in question, Eugene Witvoet, was premature, and that the trial judge did not make a sufficiently extensive inquiry to determine whether Witvoet could be a fair and impartial juror. Defense counsel did not object to the removal of Witvoet, and he did not raise the matter in his post-trial motion. It may be that defense counsel had his own reasons for not wanting Witvoet to serve as a juror in the case and therefore did not object to his removal. (See *People v. Brisbon* (1985), 106 Ill. 2d 342, 357.) We shall consider the issue on its merits, however, for the improper removal of a qualified juror for his purported opposition to capital punishment is not harmless error (see *Gray v. Mississippi* (1987), 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045; *Davis v. Georgia* (1976), 429 U.S. 122, 50 L. Ed. 2d 339, 97 S. Ct. 399 (*per curiam*)), and the defendant also contends that counsel's procedural default constituted ineffective assistance of counsel.

The trial judge initially asked the group of prospective jurors the question, "Is there any juror out there under no circumstances would they consider the death penalty? I'm not asking whether you like it or not like it. I'm asking under no circumstances will you consider it. Anybody?" Several persons, including Mr. Witvoet, responded affirmatively; the trial judge asked Mr. Witvoet why he opposed capital punishment:

"THE COURT: Why are you against it?

MR. WITVOET: Bible says, 'Thou shalt not kill.' It doesn't say any ifs, ands or buts.

THE COURT: Do you know how many people got killed in the Old Testament in the name of God?

MR. WITVOET: Right."

When it was Mr. Witvoet's turn for individual examination by the judge, the following exchange took place:

"THE COURT: Gentleman behind.

Your name, sir.

A. Witvoet, Eugene.

Q. You're one of the gentlemen that said under no circumstances could you possibly impose a death penalty, is that correct?

A. Right.

THE COURT: Okay. You're excused."

The defendant contends that a fuller inquiry was necessary before the juror could be excused for cause.

We believe that the trial judge's removal of juror Witvoet was consistent with *Witt* and *Adams*. The applicable standard for excusing a juror for cause because of his opposition to capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.) The trial judge first asked the venire generally if there were any persons who under no circumstances could be able to impose the death penalty; Witvoet responded affirmatively, and his explanation for his opposition to capital punishment indicated that his views were based on religious grounds. Witvoet later agreed that he had said earlier that he could not impose the death penalty under any circumstances. The trial judge was justified in concluding from those responses that Witvoet's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror" at a death

penalty hearing. Moreover, the trial court's decision to remove Witvoet for cause is entitled to deference, given the superior position of the trial judge to gauge the meaning of the prospective juror's responses to the questions that were asked. (See *People v. Collins* (1985), 106 Ill. 2d 237, 280; *People v. Stewart* (1984), 104 Ill. 2d 463, 486.) We conclude that the trial judge did not err in excusing juror Witvoet for cause. Accordingly, we need not consider the defendant's related contention that counsel failed to preserve the issue for review and in that respect was ineffective.

## VI

Next, the defendant argues that he was denied the effective assistance of counsel at his sentencing hearing because defense counsel did not present any evidence in mitigation and made neither an opening statement nor a closing argument.

This court has held that the failure to present any evidence in mitigation at a capital sentencing hearing does not automatically constitute ineffective assistance of counsel. (*People v. Gaines* (1984), 105 Ill. 2d 79, 94-95; *People v. Kubat* (1983), 94 Ill. 2d 437, 488.) Here, the defendant's record shows a virtually uninterrupted history of criminal conduct that began in 1971 and that culminated in the offenses for which the defendant was sentenced to death. During that period the defendant was convicted of a series of armed robberies, and he committed the offense here within a month of his parole from prison. The defendant has not brought to our attention any mitigating evidence that should have been introduced for the jury's consideration. See *People v. Gaines* (1984), 105 Ill. 2d 79, 94-95.

Moreover, it must be noted that counsel's conduct at the sentencing hearing was in conformity with the

defendant's wishes at that time. The following colloquy took place during the hearing:

"THE COURT: Have you talked to your client?

MR. SAMMONS [defense counsel]: Yes, I have, Judge. And my client wishes me to present no evidence, make no argument and wishes to remain in the back.

MR. BRADY [an assistant State's attorney]: Judge, at this point, I would ask that he be brought out and state that for himself. I just think that for the record, we probably should have the defendant come out.

THE COURT: Bring him out.

MR. BRADY: For the record.

THE COURT: All right. Mr. Emerson, you heard what your attorney just said, that you basically have no evidence to presence [sic] in mitigation. And you have no witnesses and you do not wish to be out here, is that correct, sir?

MR. EMERSON: (nodding)

THE COURT: Did you hear that in the back?

MR. EMERSON: No. I was listening.

THE COURT: Pardon me?

MR. EMERSON: I wasn't listening.

THE COURT: Is the speaker on in the back if you want to listen?

MR. EMERSON: Yeah, it's on.

THE COURT: Okay. Fine, sir. So, you don't want to present any evidence, is that correct, sir? You have a right to present any evidence, is that correct, sir?

MR. EMERSON: I don't want to.

THE COURT: Okay. Fine, sir. You wish to remain in the back as opposed to sitting in the courtroom?

MR. EMERSON: Yeah."

Thus, counsel's conduct at the sentencing hearing was consistent with the defendant's stated wishes. (See *People v. Johnson* (1986), 114 Ill. 2d 170, 206-07.) On this record, then, we do not believe that the defendant can now complain of counsel's failure to present evidence or argument at the sentencing hearing.

## VII

The defendant also makes a number of constitutional challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) under the eighth and fourteenth amendments to the Federal Constitution (U.S. Const., amends. VIII, XIV). The defendant first argues that the exemption from capital punishment of those who must be tried with the aid of special communicative assistance (see Ill. Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b)) is selective and arbitrary. We have previously rejected this argument, however (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 460-62), and we decline to reconsider those holdings here.

The defendant next contends that the death penalty statute is unconstitutional because it does not provide adequate safeguards to prevent the arbitrary or capricious imposition of the penalty. This court has previously rejected challenges to the statutory infirmities asserted by the defendant here. The statute is not invalid for the discretion accorded to the prosecutor in determining whether to seek imposition of the death sentence. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The State's evidence in aggravation need not be limited to information disclosed in advance to the defendant, and there is no requirement that the sentencing authority provide a written memorial of its reasons for imposing the death penalty. (*People v. Hall* (1986), 114 Ill. 2d 376, 420; *People v. Albanese* (1984), 104 Ill. 2d 504, 540-41.) The statute is not invalid for failing to require the State to prove the absence or nonexistence of mitigating circumstances sufficient to preclude the death penalty. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82; *People v. Free* (1983), 94 Ill. 2d 378, 421; *People v. Brownell* (1980), 79 Ill. 2d 508,

531-34.) There is no requirement that the sentencing authority make a separate finding that death is the appropriate penalty. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 462-63; *People v. Morgan* (1986), 112 Ill. 2d 111, 147.) Comparative proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and the Illinois statute is not invalid for failing to set out methods for that type of review (*People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44).

The defendant makes the additional argument that the statutory scheme fails to narrow, to a unique and cognizable group, those persons who are eligible for the death penalty. The defendant bases this argument on section 5—8—1(a)(1) of the Unified Code of Corrections. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) That provision includes as criteria for the imposition of a term of natural life imprisonment the aggravating circumstances used for determining eligibility for the death penalty. We recently rejected the same argument (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 463-65), and we adhere to that decision.

The defendant next claims that an instruction used at the sentencing hearing improperly precluded the jury from considering sympathy for the defendant. At both the first and second stages of the bifurcated sentencing hearing, the trial judge gave the jury an instruction in the form of Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981) (IPI Criminal 2d) (see IPI Criminal 2d No. 7A.10 (use at first stage of sentencing hearing); IPI Criminal 2d No. 7A.14 (use at second stage of sentencing hearing)). As it was used in the proceedings here, the instruction included the following paragraph:

"Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry."

The defendant contends that the quoted language improperly precluded the sentencing jury from considering sympathy for him in its deliberations. The defendant acknowledges that no objection was made to the use of the instruction, but he contends that counsel's failure to preserve the issue for review would constitute ineffective assistance if the instruction were in fact erroneous or improper.

This court has previously approved the sympathy and prejudice paragraph of IPI Criminal 2d No. 1.01 for use in capital sentencing proceedings (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445), and we do not believe that a different result is compelled by the Supreme Court's recent decision in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. In *Brown* the Supreme Court approved for use in capital sentencing hearings an instruction cautioning jurors not to be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." (479 U.S. 538, 540, 93 L. Ed. 2d 934, 939, 107 S. Ct. 837, 839.) The Court did not believe that the instruction would have the effect of precluding the jury from considering relevant mitigating evidence regarding the defendant's character, record, or offense. Rather, the jury would "understand the instruction not to [consider] 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." (479 U.S. 538, 542, 93 L. Ed. 2d 934, 940, 107 S. Ct. 837, 840.) We believe that jurors would give a similar interpretation to the instruction that was used here, and accordingly we find no error in its continued use.

## VIII

In a supplemental brief filed in this court following oral argument, the defendant contends that his conviction for aggravated arson must be reversed because the the statute defining the offense has been invalidated. The defendant was charged with aggravated arson under section 20—1.1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 20—1.1(a)(1)), and we have since found that provision to be unconstitutional (*People v. Johnson* (1986), 114 Ill. 2d 69). Accordingly, the defendant's conviction for that offense must be reversed.

The defendant makes the related argument that a new capital sentencing hearing is required because, he believes, the jury considered the invalid conviction at the first phase of the sentencing hearing. We do not agree. Although the jurors obviously were aware of the defendant's conviction for aggravated arson, having convicted him of that offense the previous day, it is apparent from the record that the now-invalid conviction played no role in the jury's determination that the defendant was eligible for the death penalty. Eligibility for the death penalty was based here on the occurrence of the murder during the defendant's commission of a felony (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)), and in the instruction and verdict forms provided to the jury, the other felony was alleged to be armed robbery, not aggravated arson. In this case, then, the invalid conviction did not serve as a predicate for the defendant's eligibility for the death penalty, and we need not determine whether a valid, independent basis also existed to sustain that determination. *Cf. Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733; *People v. Gaines* (1981), 88 Ill. 2d 342.

Nor do we believe that the invalidity of the aggravated arson conviction vitiates the jury's later determination, made at the second part of the sentencing hear-

ing, that the death sentence should be imposed in this case. The jury would have been free to consider the defendant's conduct even if there had been no separate charge of aggravated arson, and the absence of that conviction would not have affected the jury's decision here. Even without an offense of aggravated arson, the jury would have been aware of the defendant's conduct of setting the fire and of trapping the two victims in the burning room, conduct that could form the basis for a properly defined criminal offense.

## IX

For the reasons stated, the defendant's conviction for murder and his sentence of death are affirmed; his convictions for attempted murder and armed robbery are affirmed, and his conviction for aggravated arson is reversed. The clerk of this court is directed to enter an order setting Wednesday, March 16, 1988, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed in part*
*and reversed in part.*

JUSTICE WARD, dissenting:

I believe that the majority seriously errs in holding that the trial judge properly denied the defendant's motion for automatic substitution of judge because, the majority says, the case on remandment was with respect to

statutory provisions for automatic substitution a continuation of the original proceedings.

It is clear that the right to substitution is an absolute one. This court in *People v. Peter* (1973), 55 Ill. 2d 443, 458, stated:

"Under section 114—5 of the Code of Criminal Procedure, the absolute right to a change of venue previously given to the defendant was retained in paragraph (a)."

See also *People v. Samples* (1982), 107 Ill. App. 3d 523, 526.

Too, there is no question that the statutory provision for substitution should be liberally construed. In *People v. Smith* (1963), 28 Ill. 2d 445, 447, this court observed:

"The Statutory provisions with respect to a change of venue should receive a liberal rather than a strict construction and should be construed to promote rather than to defeat an application for a change of venue, particularly where prejudice on the part of the judge is charged."

The trial judge denied the motion as untimely "because the case was not a new one but rather had been on his call for a long time." That decision offended the intendment of section 114—5(a). The core of the provision is that substitution is to be allowed on the accused's perception that the "judge is so prejudiced against him that he cannot receive a fair trial." A liberal construction would require that a motion for substitution of a judge who presided over a trial and the introduction of the evidence of the defendant's guilt, who refused to disturb a jury's verdict of guilty, and who sentenced the defendant to death should have been allowed. To hold otherwise is to frustrate the purpose of the statute, which is to allow an accused one substitution of judges as an unquestioned right. A judge who has sentenced an accused to death may certainly be considered to have a fixed view of the defendant's guilt. *People v. McWilliams* (1932), 350 Ill. 628, 632, involved a

denial of a change of venue sought under the predecessor statute to section 114—5(a). When this court reversed the imposition of the death penalty, the defendant on remandment moved for a change of venue, stating that the judge who was to hear the cause had presided at the defendant's trial and had sentenced him to death. This court, in holding the denial of the motion was error, said the statute should be construed to promote rather than to defeat the right to a change of venue, especially where prejudice on the part of the judge was charged. The court said that the right of a defendant who complies with the statute is absolute and declared that the denial of such a petition was reversible error. In *People v. Smith* (1963), 28 Ill. 2d 445, the case had been remanded for a new trial. Upon reversal, the People had another indictment returned against the defendant charging him with the same crime. The defendant moved for a change of venue because the judge who was to hear the case on remand had presided at the trial which resulted in the defendant's conviction of robbery. This court reversed the denial of the defendant's motion, holding in effect that the proceeding under the new indictment, though for the same crime, was not to be considered as simply an extension of the proceeding under the first indictment. This court said that though the question was novel, it was to be considered in light of the principle that a motion for change of venue is to be liberally construed and that the right to a change of venue upon a proper motion is absolute.

I consider that the majority gravely errs in holding that the judge who presided at the trial could properly conduct the trial on remandment on the ground that the new trial was simply a continuation of the original proceeding. As this court did in a resembling situation in *People v. McWilliams* (1932), 350 Ill. 628, I would regard the denial of the defendant's motion as reversible error.

CLARK, C.J., and SIMON, J., join in this dissent.