GREGORY NEAL LEONARD, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 33732

January 30, 2001                                                    17 P.3d 397

---

[Rehearing denied May 8, 2001]

*JoNell Thomas,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Peggy A. Leen,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, YOUNG, J.:

The State charged appellant Gregory Neal Leonard with the murder and robbery of Tony Antee. The State sought the death penalty for the murder. The case proceeded to a jury trial. Leonard's first and second trials resulted in mistrials. His third trial resulted in his conviction for first degree murder and robbery. The jury imposed a death sentence for the murder, finding two aggravating circumstances: (1) the murder occurred in the commission of or an attempt to commit robbery; and (2) Leonard had been convicted of another murder.

The judgment of conviction was entered on January 5, 1999. The district court sentenced Leonard to a concurrent imprisonment term for the robbery. This appeal followed. We affirm Leonard's conviction and sentence of death.

## FACTUAL SUMMARY

### Guilt phase evidence

The victim's body was discovered in Leonard's apartment, under his bed. The impetus behind discovery of the body was Jesus Cintron's disclosure to police that Leonard had made inculpatory statements to him.

Cintron testified for the State at trial. At the time of the victim's death, Cintron and Leonard were both employed by the Mark Twain Apartments in Las Vegas, performing general maintenance and repair. Leonard lived in an apartment near the maintenance shop, but Cintron was living elsewhere at the time. Cintron testified that he spoke with Leonard by phone on three occasions on Sunday, January 22, 1995. On the first two occasions, Leonard asked Cintron to come to the Mark Twain Apartments because there was something that he needed to talk to him about. Leonard refused to tell Cintron what he wanted, and Cintron refused to meet Leonard.

That evening, Leonard left a voice message on Cintron's pager. After reviewing his statement to police, Cintron testified that the message was "Say yo, slick. Give me a call at 252-1010 or ten more people gonna die." Cintron called the number and reached a pager, and Leonard called Cintron back. Cintron had caller ID that indicated the call was from the Mark Twain Apartments.[1] Leonard told Cintron that he had killed someone the previous

---

[1]Leonard did not have a functional phone in his apartment, and he regularly used the phone in the maintenance shop of the apartment complex.

night and that the body was under his bed. Leonard indicated that he was using the pager of the person he had killed. Leonard asked Cintron to help dispose of the body. Leonard planned to wrap the body in carpet and leave it in a dumpster. Cintron told Leonard that he was crazy, and then Leonard threatened to kill Cintron and several others.[2]

Cintron subsequently contacted the police and played the voice message that Leonard had left on his pager. Several police officers acknowledged the poor quality of the recording. However, one officer testified that he had recognized Leonard's voice. Although police returned the pager to Cintron without recording the message, the substance of the message was memorialized in an affidavit supporting Leonard's arrest and in Cintron's tape-recorded statement.

Police went to the Mark Twain Apartments, where they came into contact with Leonard and subsequently spoke with him at the maintenance office. Leonard ultimately refused to allow police to search his apartment. Police decided to remove everyone from the apartment so that it would be secure, and Leonard agreed. There were three individuals present in Leonard's apartment at that time: Leonard's cousin, Jerry Leonard (''Jerry''), Jerry's girlfriend, Rose Lewis, and Martina Harkins. After these three were removed, a police officer conducted a sweep of the apartment to make sure that nobody else was inside. During the sweep, she discovered the victim's body under Leonard's bed.

Leonard was arrested and was found to be wearing a pager, which was later identified as belonging to the victim. The phone number for the pager was 252-1010, the same number that Leonard had given to Cintron as a contact number. Leonard volunteered that he did not know how the body had gotten under his bed because he had been out of town in Stateline for the past few days.

Cintron stopped going to work immediately after the discovery of the body at Leonard's apartment. Cintron testified that Leonard called him from jail on several occasions and that he felt that one of the calls was threatening. Cintron received money for relocation expenses from the State, and he received $1,000 from the secret witness fund.

The victim's body was recovered, autopsied, and identified as Tony Antee. The victim was wearing a T-shirt, a thermal-type

---

[2]Leonard also told Cintron that he had killed another individual, Thomas Williams; however, this fact and other facts relevant to the robbery and murder of Williams were not admitted into evidence during the guilt phase of the instant case. Leonard was ultimately convicted in the other case, and he received a death sentence. This court affirmed the conviction and sentence. *See Leonard v. State,* 114 Nev. 1196, 969 P.2d 288 (1998), *cert. denied,* 528 U.S. 828 (1999).

shirt, and briefs that were pulled down partly exposing his genitals. Three pieces of cord that came together in a plastic knob were found wrapped around the victim's neck; the cord resembled a mini-blind or curtain cord. The cord had left deep impressions that completely encircled the victim's neck.

Dr. Giles Sheldon Green performed the autopsy on the morning of January 24. Green testified that the victim had died approximately two to three days previously. Green found no evidence of sexual assault. The cause of death was determined to be asphyxia due to strangulation. Green indicated that it would take the average person about four minutes to die of strangulation and that continuous pressure would have to be applied for that time. He indicated that there was no reason to believe that it took less than that time to kill the victim. The victim's body had other minor external injuries, unrelated to the cause of death. These included an abrasion and a small scratch to the victim's forehead, which Green indicated were made about the time of the victim's death. Internal examination indicated bruising to the victim's head; these injuries had also been inflicted recently, less than a day prior to the victim's death. The injuries to the victim's head were possibly sufficient to stun the victim or even cause unconsciousness. The victim had a blood-alcohol content of .02 percent.

Little other relevant physical evidence was recovered that might indicate the circumstances of the murder. However, a bloodstained carpet sample was taken from a spot near the entranceway of Leonard's apartment. DNA testing indicated that the blood on the sample was the victim's. A rubber glove with a trace amount of blood was found in a basket on the bottom shelf of a coffee table in Leonard's apartment. Three blood spots were found on the bathroom floor of Leonard's apartment; testing indicated that the blood could have come from the victim or from Leonard since they had the same blood type.

There is little evidence about the victim's actions prior to the murder, although many of the witnesses, in addition to Leonard, knew or had at least met the victim, including Cintron, Jerry, and Rose Lewis. Vincent Altamura, an acquaintance of the victim, testified that he tried to contact the victim on Sunday, January 22. He paged the victim at approximately 3:00 p.m., and someone other than the victim responded to the page.

Several witnesses testified to Leonard's actions prior to discovery of the body. Leonard's cousin, Jerry, testified that he went to Leonard's apartment on the morning of Sunday, January 22, and was there for much of the day. When Jerry arrived, Leonard was wearing a robe, and it appeared that he had just awoken. Martina Harkins was in the bedroom. Harkins left later that day. Jerry

indicated that Leonard was acting strangely and that Leonard was in and out of the apartment during the day. Jerry left at about 4:00 p.m. to walk Rose Lewis to an interview, and he returned with Lewis a couple of hours later. During the evening, Gladys Burton came into the apartment for a time. Harkins returned to the apartment in the late evening, shortly before the police arrived. Jerry further testified that Leonard had sent him a letter in March or April of 1995 asking him to testify falsely in the case (apparently to implicate Cintron), but that he had not saved the letter.

Gladys Burton also testified. Burton had been involved in a short relationship with Leonard a few weeks prior to the murder. She was at Leonard's apartment on Friday night, January 20, from approximately 8:00 or 9:00 p.m. until approximately 2:00 a.m. the next morning. Leonard's cousin and girlfriend were also there. Burton did not see Leonard on Saturday, but she spoke with him by phone on several occasions. Leonard visited Burton for a short time early Sunday afternoon. Leonard ''was kind of broke down [sic] and kind of sad,'' and at times he had tears in his eyes. Leonard and Burton made plans to see each other again that evening.

In the evening, Burton picked up Leonard and later visited his apartment for a short time. Leonard ''was acting very differently,'' and at one point he said, ''you don't know what I did . . . last night.'' Leonard gave Burton a broken necklace, which she later gave to the police; the necklace was identified by the victim's sister as being similar to one worn by the victim.[3]

The defense called two witnesses, Lori Knight, former manager of the Mark Twain Apartments, and Martina Harkins. Leonard did not testify. The defense attempted to call into question the credibility of Jerry Leonard and Jesus Cintron and to suggest that they might have been involved in the killing.

*Penalty phase*

In the penalty phase, the State presented Leonard's judgment of conviction for the murder and robbery of Thomas Williams (with the sentence redacted). The State presented the testimony of a pathologist and a detective concerning the circumstances of Williams' murder, which also involved strangulation of the victim. The State also presented victim impact evidence from the victim's sister in the instant case.

The defense did not present evidence or argument at the penalty phase. Defense counsel indicated that Leonard had requested that they not call certain witnesses.

---

[3]The victim's sister testified that she did not see the necklace in the victim's personal effects after the murder.

## DISCUSSION

On appeal, Leonard raises numerous issues of alleged error. Before discussing Leonard's contentions, we note that Leonard failed to preserve many of his claims for appeal by making appropriate objection. Generally, failure to object will preclude appellate review of an issue.[4] *Cordova v. State,* 116 Nev. 664, 666, 6 P.3d 481, 482 (2000). This court does, however, have discretion to address issues not preserved for appeal where there is plain error affecting the defendant's substantial rights. *Id.* at 666, 6 P.3d at 482-83 (citing NRS 178.602). Accordingly, we need address Leonard's claims that were not preserved for appeal only to determine if such error occurred. Where appropriate in the following discussion, we will note instances in which Leonard did not properly preserve a claim for review on appeal.

### I. *Withdrawal of county public defender*

Leonard's original counsel, the Clark County Public Defender's Office, withdrew on the basis of a conflict of interest after discovering information about a possible alternative suspect, who was also a client of the office. Leonard makes various claims pertaining to the withdrawal and the failure of the public defender to disclose to Leonard the information that it discovered. Leonard has not demonstrated error.

The purported conflict of interest provided a facially legitimate reason for the public defender to withdraw. *See* SCR 157; SCR 166; *see also Strickland v. Washington,* 466 U.S. 668, 692 (1984) (stating that counsel has an obligation to avoid conflicts of interest). Leonard has not shown error based on a conflict of interest because he has not shown that counsel " 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348 (1980)). Further, Leonard waived any claim associated with the public defender's failure to disclose the information it discovered

---

[4]Leonard attempts to avoid this rule by asserting that trial counsel's failure to raise many of these issues in the district court constitutes ineffective assistance of counsel as a matter of law. This court will normally decline to review claims of ineffective assistance of counsel on direct appeal unless an evidentiary hearing has been held in the district court. *See Gibbons v. State,* 97 Nev. 520, 522-23, 634 P.2d 1214, 1216 (1981). Having considered Leonard's claims, we conclude that there is no reason to reach any issue of ineffective assistance of counsel at this juncture.

when he indicated that he had obtained all relevant information from other sources.[5]

## II.  *Individual voir dire*

Leonard contends that the district court erred in refusing to allow individual voir dire of all prospective jurors. Leonard supports his contention by arguing that there was extensive pretrial publicity in the case and thus, individual voir dire was necessary to explore what prospective jurors had learned about the case. Leonard also emphasizes that this is a capital case and asserts that there was a possibility of racial prejudice.

The district court has discretion in deciding a request for individual voir dire. *See Haynes v. State,* 103 Nev. 309, 316, 739 P.2d 497, 501 (1987); *see also Mu'Min v. Virginia,* 500 U.S. 415, 427 (1991). Absent an abuse of discretion or a showing of prejudice to the defendant, this court will not disturb the district court's decision. *Haynes,* 103 Nev. at 316, 739 P.2d at 501.

Here, the record reflects that the district court ensured sufficient inquiry of the prospective jurors, including inquiry into pretrial publicity. The court permitted counsel broad discretion in asking questions of the potential jurors. If defense counsel were concerned about a particular prospective juror, they could have requested individual, sequestered voir dire of that person. *See generally Haynes,* 103 Nev. at 316, 739 P.2d at 501 (stating that defense counsel could have requested independent, sequestered voir dire of prospective jurors who were suspected of holding back on an issue).

Further, Leonard has not shown that he was prejudiced. Leonard cites five prospective jurors who indicated in court that they had prior exposure to the case through the news media. However, all of these individuals were ultimately excused for cause, for various reasons.

## III.  *Removal of prospective jurors for cause*

Leonard asserts that the district court applied an erroneous standard in excusing prospective jurors for cause because of their

---

[5]Leonard's new counsel sought disclosure of the information that the public defender had discovered. After the district court ordered limited disclosure, Leonard's counsel and the public defender both sought relief by filing writ petitions in this court. We dismissed the writ petitions as moot after Leonard represented that he had obtained the information that he wanted from other sources. The district court subsequently vacated its prior order.

views on the death penalty. Leonard argues that the district court erroneously considered whether prospective jurors could "equally" consider the three possible punishments and erroneously excused individuals pursuant to this standard.

We agree that "equal" consideration of the three possible forms of punishment, including death, is not required. Rather, the proper question is whether a prospective juror's views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45 (1980)).

Further, the death penalty is reserved for a limited class of offenders. Although "equal" might be equated with "fair" consideration, it is susceptible to being interpreted to require that jurors accord the same consideration to each of the possible penalties. There is no such requirement under Nevada law. The death penalty is permissible only where at least one aggravating circumstance is proven beyond a reasonable doubt and where any mitigating circumstances do not outweigh the aggravating circumstance or circumstances. *See* NRS 200.030(4)(a). Even assuming these conditions are met, the jury has discretion not to impose death.

Although the voir dire and jury questionnaire both contained references to the need for jurors to afford equal consideration to the possible penalties, Leonard failed to object to this language.[6] We are not persuaded that Leonard has demonstrated plain error that would warrant relief, notwithstanding his failure to object.[7] We specifically reject Leonard's contention that references to

---

[6]The questionnaire included an explanation of the penalty phase procedure and questions about the prospective jurors' views on the penalties. Although question 54 simply asked whether prospective jurors were "open to considering all three forms of punishment," question 55 further inquired: "In your present state of mind, can you, if selected as a juror, consider *equally* all three possible forms of punishment and select the one that you feel is the most appropriate depending upon the facts and the law?" (Emphasis in original.) If the answer was "no," the questionnaire called for an explanation.

[7]It appears that the district court did not reject out of hand every prospective juror who indicated difficulty in affording "equal" consideration to the possible punishments. In context, the equal consideration inquiry could have been directed at determining whether prospective jurors could fairly consider the death penalty and the other penalty options. Indeed, both the State and the defense inquired further to clarify the position of certain prospective jurors who indicated that they could not consider the punishments equally. The district court did not preclude such inquiry. In general questioning of

equal consideration "tainted the instructions given to the jury" about punishment. "A jury is presumed to follow its instructions." *Weeks v. Angelone,* 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh,* 481 U.S. 200, 211 (1987)). Presumably, the jury followed the instructions it received at the penalty phase. That leaves only the question of whether any prospective juror was erroneously excused for cause because of his or her views on the death penalty. If a prospective juror was erroneously excused, then reversal of Leonard's death sentence is warranted. *See Gray v. Mississippi,* 481 U.S. 648 (1987); *Davis v. Georgia,* 429 U.S. 122 (1976).

After having considered each of the instances cited by Leonard involving prospective jurors who were excused for cause, we conclude that Leonard has not demonstrated that any individual was erroneously excused. The court afforded the parties ample inquiry to explore each prospective juror's views on the death penalty. During questioning, most of the individuals cited by Leonard unequivocally indicated that their views would prevent or substantially impair their ability to properly consider all of the penalty options, including the death penalty. However, prospective juror no. 129 merits more specific comment and consideration.

Prospective juror no. 129 explained that she could "probably" consider the death penalty in some situations and that it could be "occasionally" appropriate but "probably in very few circumstances." She favored abolishing the death penalty, and stated that she did not think it "does any good." She indicated that she would have a "hard time" looking the defendant in the eye and, with her fellow jurors, telling him he deserved to die. She represented that she would "probably give much more weight to either choosing prison with parole or prison without than the death penalty."

Having considered the complete transcript of the in-court questioning of prospective juror no. 129, we are persuaded that

prospective jurors, the court explained that it was concerned with those prospective jurors who had serious difficulties with the penalty options:

> But what the Court needs to find out is, do we have any individuals that for whatever reason, and at this time we don't know the reasons, we'll ask about it later, but that you would *not be able to impose the forms of punishment equally,* that's if you would decide that there was first-degree murder, that you would not equally be able to consider life with the possibility of parole, or life without the possibility of parole or the death penalty, you have a problem, *so much of a problem with one of those items where you wouldn't consider it or that's the only one you could impose,* if you would tell us now. That helps us when we begin the questioning later.

(Emphases added.)

Leonard has not demonstrated plain error that would entitle him to relief, notwithstanding defense counsel's failure to object to the prospective juror's removal for cause.[8] We are mindful of the importance of proper objection, which affords the district court an opportunity to avoid error by reconsidering or clarifying the basis for its decision. This is particularly true here, where the observations of the district court and the parties are important. The trial court has broad discretion in ruling on challenges for cause since these rulings involve factual determinations. *Walker v. State,* 113 Nev. 853, 865, 944 P.2d 762, 770 (citing *Witt,* 469 U.S. at 428-29). The trial court is better able to view a prospective juror's demeanor than a subsequent reviewing court. *See Darden v. Wainwright,* 477 U.S. 168, 178 (1986).

Further, "counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering." *Witt,* 469 U.S. at 431 n.11. Leonard's failure to object might reflect a tactical decision by counsel that is not susceptible to review on direct appeal.[9]

Given these concerns, there is no plain error under the facts of this case because the record does not unequivocally reflect that the district court erred in excusing prospective juror no. 129. It is not necessary that a prospective juror's "bias be proved with 'unmistakable clarity' " in the printed record. *Witt,* 469 U.S. at 424. Prospective juror no. 129 expressed serious reservations about the death penalty that raised doubts as to whether she would be able to set aside those concerns and follow the law in this case. She indicated not only a strong preference for punishments other than the death penalty, but real uncertainty about her ability to return a death verdict.

In sum, we conclude that Leonard has not demonstrated plain error. Nevertheless, we are concerned that questions and refer-

---

[8]The court excused prospective juror no. 129 for cause without specific objection by Leonard. The record reflects that Leonard had opportunity to object but failed to take advantage of it.

[9]Leonard's failure to object might be "an indication of his contemporaneous impression that the juror was biased and properly excluded." *McKenna v. State,* 101 Nev. 338, 343, 705 P.2d 614, 617 (1985). Alternatively, counsel might have had other reasons for failing to object. For example, failure to object "may have been a deliberate decision on defense counsel's part who, for his own reasons, may not have wanted the person as a juror." *People v. Pitsonbarger,* 568 N.E.2d 783, 794 (Ill. 1990) (citing *Witt,* 469 U.S. at 437 (Stevens, J., concurring in judgment); *People v. Emerson,* 522 N.E.2d 1109, 1119 (Ill. 1987)).

ences indicating the need to afford equal consideration to the possible punishments may be misleading. As discussed above, language referring to the need for equal consideration does not accurately reflect Nevada law. Accordingly, we direct the district courts to refrain from utilizing such language in future proceedings, either by way of the jury voir dire or the jury questionnaire.

## IV. *State's failure to preserve pager message*

Leonard challenges the State's failure to preserve the recording of the message left on Jesus Cintron's pager. He claims that the district court erred by failing to dismiss the charges or, alternatively, preclude testimony about the message. He argues that it was fundamentally unfair for the State to present testimony about the pager message when the State did not afford him the means to directly challenge the source of the evidence.

The State's loss or destruction of evidence constitutes a due process violation only if the defendant shows either that the State acted in bad faith or that the defendant suffered undue prejudice and the exculpatory value of the evidence was apparent before it was lost or destroyed. *Sheriff v. Warner,* 112 Nev. 1234, 1239-40, 926 P.2d 775, 778 (1996); *see also Arizona v. Youngblood,* 488 U.S. 51 (1988). Where there is no bad faith, the defendant has the burden of showing prejudice. *See Warner,* 112 Nev. at 1240, 926 P.2d at 778. The defendant must show that " 'it could be reasonably anticipated that the evidence sought would be exculpatory and material to [the] defense.' " *Id.* (quoting *Boggs v. State,* 95 Nev. 911, 913, 604 P.2d 107, 108 (1979)). It is not sufficient to show " 'merely a hoped-for conclusion' " or " 'that examination of the evidence would be helpful in preparing [a] defense.' " *Id.*

Here, Leonard filed a motion to dismiss the case or, in the alternative, to suppress evidence of the message. The district court held a hearing on the motion. At the conclusion of the hearing, the district court denied Leonard's motion, stating that bad faith of the State was not an issue and holding that Leonard had not shown that the evidence had exculpatory value that was apparent before it was destroyed.

We conclude that the district court did not err. First, there is no evidence that the State acted in bad faith. Second, Leonard did not demonstrate that it could reasonably be anticipated that the message was exculpatory. Although Leonard denied leaving the message, other credible evidence contradicted his contention.

Leonard also argues that the district court should have excluded evidence of the pager message as hearsay. We note, however, that there was credible testimony of the message's content and that Leonard was the source of the message. Thus, the message was not hearsay because it was admitted against Leonard as his own incriminating statement. NRS 51.035(3). For the same reason, Leonard was not denied his constitutional confrontation rights.

Alternatively, Leonard asserts that the court should have instructed the jury that due to the failure to preserve the message it should presume the evidence was adverse to the State.[10] Leonard has failed to specifically cite to any portion of the record where he requested special instruction on such a presumption. Moreover, we conclude that such instruction was not warranted given the facts of this case.

### V. *Vincent Altamura's conversation with unidentified caller*

Leonard argues that the district court erred by failing to exclude hearsay testimony about the conversation that Vincent Altamura had with an unidentified caller. Leonard claims that the conversation was not properly authenticated. Leonard also asserts that the error implicated his right of confrontation.

The evidence at issue concerns the telephone call that Altamura received after he paged the victim. Altamura indicated that the caller sounded like a young male. The caller informed Altamura that Altamura had called Greg's pager, not the victim's, "and that Greg was too fucked up to come to the phone." The court instructed the jury not to consider the testimony as evidence of who had possession of the pager, but only as evidence of whether the victim was alive at the time.

Leonard persuasively argues that the same purpose might have been served if Altamura had simply testified that someone other than the victim had responded to the page. However, we recognize that the district court has some discretion in admitting evidence pursuant to NRS 47.110. NRS 47.110 permits the trial court to admit evidence that is admissible for one purpose but inadmissible for another if, upon request, the judge instructs the jury accordingly. Moreover, any error is harmless. Even if the conversation should have been excluded, it did little more than

---

[10]Leonard notes that NRS 47.250 contains the following disputable presumptions: "(3) That evidence willfully suppressed would be adverse if produced;" and "(4) That higher evidence would be adverse from inferior being produced."

reaffirm that Leonard had the victim's pager on Sunday, January 22, a fact supported by other credible evidence.

## VI. *Leading questions*

Leonard claims that the district court improperly afforded the State latitude in asking leading questions of State witnesses.

Specifically, the State requested latitude in leading the State's lay witnesses who were familiar with the facts of both this case and Leonard's other murder case. The State noted that the prior trial resulted in a mistrial when one witness made a reference to the other murder. The defense objected, indicating that the State should carefully caution the witnesses at issue to avoid improper areas. The district court rejected the defense objection and concluded that it would afford the State some latitude in leading the witnesses. However, the court cautioned: "I agree with [the] defense that the critical information should come from the testimony of those witnesses, not from the attorneys for the State." Defense counsel clarified that the defense understood the court's ruling but that they would be making necessary objections as they arose.

Given these facts, we conclude that Leonard has not demonstrated that the district court erred. NRS 50.115(3)(a) provides that leading questions are generally impermissible on direct examination "without the permission of the court." Thus, the statute provides some discretion to the court in this area. Further, " '[w]hether leading questions should be allowed is a matter mostly within the discretion of the trial court, and any abuse of the rules regarding them is not ordinarily a ground for reversal.' " *Barcus v. State,* 92 Nev. 289, 291, 550 P.2d 411, 412 (1976) (quoting *Anderson v. Berrum,* 36 Nev. 463, 470, 136 P. 973, 976 (1913)). Moreover, Leonard has failed to demonstrate, with specific citation to the record, that he objected to particular instances of inappropriate leading questions.

## VII. *Limitation on cross-examination of Jesus Cintron*

Leonard claims that the district court improperly limited his cross-examination of Jesus Cintron. We address each of three instances of alleged error in turn.

First, the district court sustained the State's objection, on relevance grounds, to the question: "Did you transact any business with [the victim]?" This question, however, had been essentially

asked and answered by Cintron. Defense counsel previously asked whether Cintron had "any kind of business relationship" with the victim, and Cintron indicated that Cintron did not have a business. Moreover, defense counsel subsequently inquired whether Cintron had told anyone that he had conducted business with the victim; Cintron answered no, reiterating that he did not have a business. Under these circumstances, we conclude that the court did not improperly restrict the defense inquiry.

Second, the district court sustained the State's objection to the question of whether Cintron read "any paperwork" at Leonard's apartment prior to the weekend of January 21-22. Leonard has not demonstrated that the district court restricted the defense inquiry in any way. The court instructed defense counsel "to be a little more specific with that question." The prosecutor and defense counsel asked to approach the bench, an unreported bench conference followed, and then defense counsel commenced a new line of questioning.

Third, Leonard argues that the district court improperly restricted impeachment of Cintron on the non-monetary benefits that he received from the State. Before Cintron testified, the district court held a short evidentiary hearing outside of the presence of the jury to resolve issues concerning the scope of impeachment. At the conclusion of the hearing, the court decided to permit impeachment of Cintron regarding monetary assistance and benefits he received but declined to permit impeachment in other areas. Specifically, it appears that the State rendered some assistance to Cintron when he had difficulties with the law that arose well after Cintron's initial disclosures to police in this case.

Having reviewed the record, we conclude that there are three areas of impeachment that were precluded and that were supported by some evidence: (1) Cintron was released from jail after intervention by the district attorney's office in a prior case; (2) Cintron might have received assistance from the district attorney's office in getting his car back after it was towed; and (3) the district attorney's office intervened on Cintron's behalf on two occasions so that Cintron would have additional time to pay a fine. In denying the defense request to impeach Cintron concerning the extensions of time that Cintron received to pay a fine, the court noted that it was standard for the courts to grant such extensions.

The value of the impeachment evidence here is limited. The probative value of the evidence to show bias was substantially diminished by the fact that Cintron came forward and cooperated with the police before he received any favorable consideration. It is unlikely that Cintron came forward with the expectation that the State would afford him special consideration if and when he had

subsequent difficulties with the law. Further, the kind of assistance rendered by the State appears to have been minor; for example, the State did not dismiss criminal charges based upon Cintron's cooperation in this matter. Finally, there is no evidence that the assistance Cintron received was contingent upon Cintron's agreement to testify in this case.

Given the limited value of the impeachment evidence and the fact that the impeachment would have necessitated reference to Cintron's otherwise inadmissible prior criminal conduct, we conclude that the district court acted within its discretion in restricting impeachment. We recognize that the district court has less discretion to curtail cross-examination where potential bias is at issue. *See Jackson v. State,* 104 Nev. 409, 412, 760 P.2d 131, 133 (1988); *Bushnell v. State,* 95 Nev. 570, 572, 599 P.2d 1038, 1040 (1979). Nevertheless, and consistent with the Confrontation Clause,[11] trial judges "retain wide latitude" to restrict cross-examination to explore potential bias "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *see also Davis v. Alaska,* 415 U.S. 308, 316, 320 (1974); *Bushnell,* 95 Nev. at 573, 599 P.2d at 1040 (recognizing that an inquiry into a witness's possible bias or motive to testify may be restricted when the inquiry was "repetitive, irrelevant, vague, speculative, or designed merely to harass, annoy or humiliate the witness").

Moreover, we conclude that any error is harmless even assuming that the district court should have afforded greater latitude to defense counsel in these areas. We reiterate that the impeachment evidence does not call Cintron's credibility into serious question, and we note that there is no persuasive evidence of his involvement in the murder and that his account of his conversation with Leonard was corroborated by the finding of the victim's body under Leonard's bed.

VIII. *Disclosure of presentence investigation reports*

Leonard asserts that the district court might have erred in failing to order the disclosure of presentence investigation reports requested by the defense, and that this court should order the reports for its own in camera inspection. Leonard has not shown

---

[11]*See* U.S. Const. amend. VI.

that he was denied any information pertinent to his request; thus, in camera review by this court is unnecessary.[12]

## IX. *Prior consistent statements*

Leonard asserts that the State improperly elicited and referred to prior consistent statements and related testimony to bolster its witnesses. Prior consistent statements are generally inadmissible hearsay unless "offered to rebut an express or implied charge against [a witness] of recent fabrication or improper influence or motive." NRS 51.035(2)(b); *see also Patterson v. State,* 111 Nev. 1525, 1532-33, 907 P.2d 984, 989 (1995).

Here, Leonard only objected to one of the alleged instances of error. Specifically, Leonard objected when the prosecutor asked Detective Skala about any statements made to him by Jesus Cintron that were corroborated by the information on Cintron's pager. Since Skala testified before Cintron was impeached, there had been no charge of recent fabrication or bias, and thus testimony about what Cintron told police was not admissible as prior consistent statements. Nor are we persuaded that it was necessary to admit the testimony for "probable cause purposes," as the State suggested.

Nevertheless, we conclude that Leonard is not entitled to relief on his claim. The statements would have been admissible as prior consistent statements *after* Cintron was impeached with evidence of the monetary assistance he received from the State.[13] Cintron's statements to police, made prior to the time of the alleged motive to fabricate (to assist the State in exchange or in hope of further monetary compensation), could have been subsequently admitted

---

[12]Leonard initially sought disclosure of presentence investigation reports concerning State witnesses Jesus Cintron and Vincent Altamura. The district court ordered disclosure of the reports on Altamura during later proceedings. It appears that Cintron had not been convicted of a felony and that there were no relevant presentence reports concerning him. Indeed, at a hearing on his motion, Leonard only argued for the disclosure of the reports concerning Altamura.

[13]We recognize that the State elicited this impeachment evidence from Cintron on direct examination. Our review of the record reveals that the defense was going to impeach Cintron with this evidence if the State did not present it. We note that defense counsel stated in opening argument that the defense would reveal that the State witnesses had "motives and inducements to embellish or to flat out just not tell you the truth or to leave things out." More importantly, the defense had requested the district court to permit impeachment on this and other issues and the district court had granted the defense request as to this impeachment evidence.

as prior consistent statements. The premature admission of these statements was, at most, harmless error.

Leonard failed to object to the remaining instances of alleged error, and we conclude that there is no plain error under the facts of this case. Most of the references were general and did not include specific prior statements that the witnesses had made; the primary exception was certain testimony about some statements that Jesus Cintron made to police. Nevertheless, as discussed above, these statements were ultimately admissible to rebut impeachment evidence suggesting that Cintron was biased.[14]

## X.   *Sufficiency of evidence and jury instructions*

Leonard asserts that insufficient evidence supports the jury verdicts of first degree murder and robbery and the aggravating circumstance that the murder occurred in the commission of or an attempt to commit robbery. Related to these claims are Leonard's arguments that the jury was improperly instructed concerning: (1) robbery; (2) felony murder; and (3) willful, deliberate, and premeditated murder. We reject Leonard's contentions.

### *Willful, deliberate, and premeditated murder*

First, we address Leonard's claim that the jury instructions did not sufficiently and properly define the elements of willful, deliberate, and premeditated murder. Leonard specifically challenges an instruction that is virtually identical to the instruction upheld on appeal in *Kazalyn v. State,* 108 Nev. 67, 75-76, 825 P.2d 578, 583-84 (1992), *prospectively modified by Byford v. State,* 116 Nev. 215, 994 P.2d 700 (2000). In his reply brief, Leonard cites this court's recent decision in *Byford* and argues that it should be applied retroactively. Leonard asserts that the instruction was particularly misleading here, given the State's attempt to explain premeditation by analogy during closing argument.[15]

We conclude that there was no error in the instruction given to

---

[14]We further note, however, that it is improper for one witness to vouch for the testimony of another. *Marvelle v. State,* 114 Nev. 921, 931, 966 P.2d 151, 157 (1998). Further, the police investigation itself was not the issue at trial, and some testimony concerning the investigation could be deemed irrelevant insofar as it did not directly relate to the issue of Leonard's guilt or innocence. *See e.g., Zemo v. State,* 646 A.2d 1050, 1053 (Md. Ct. Spec. App. 1994). Much of the testimony cited by Leonard could alternately be considered in these contexts; however, we similarly conclude that it does not constitute plain error warranting relief.

[15]At trial, Leonard did not object to the analogy offered by the State.

the jury. In *Byford,* we reconsidered the *Kazalyn* instruction. While we did not conclude that it was error to use the instruction, we determined that further instruction explaining deliberation would be preferable in the future, and we set forth instructions for future use. *Byford,* 116 Nev. at 234-37, 994 P.2d at 713-15. Our decision in *Byford* is prospective. In *Garner v. State,* 116 Nev. 770, 6 P.3d 1013 (2000), we clarified that for convictions predating *Byford,* relief would not be warranted based solely on use of the *Kazalyn* instruction. We held that the instructions required by *Byford* were a new requirement to be given only prospective force. *Id.* at 788-89, 6 P.3d at 1024-25. Thus, the *Kazalyn* instruction adequately sets forth the standard for proving willful, deliberate, and premeditated murder in this case.

We further conclude that there is sufficient evidence of first degree murder under a theory of willful, deliberate, and premeditated murder. First, there is ample evidence that Leonard, and not some other individual, is responsible for the victim's death. Further, there is sufficient circumstantial evidence from which the jury could have inferred premeditation and deliberation. ''Evidence of premeditation and deliberation is seldom direct.'' *Briano v. State,* 94 Nev. 422, 425, 581 P.2d 5, 7 (1978). Circumstantial evidence may be considered and provide sufficient evidence to infer these elements. *See id.* Here, the manner of the crime itself—a ligature strangulation—and the physical evidence relating to that crime provide sufficient evidence to infer the requisite intent for first degree murder.

The ligature used by Leonard was apparently cut from a miniblind or curtain cord. It had been wrapped tightly around the victim's neck, leaving deep impressions that completely encircled his neck. The cord did not match the type used in Leonard's apartment, nor was there any indication that the cord had been cut or removed from the cords in the maintenance shop of the Mark Twain Apartments. Under these circumstances, it is reasonable to infer that Leonard cut the cord from some unknown source with the intent of using it as a ligature.

Further, it appears that Leonard employed stealth and planning to subdue the victim. Again, the evidence suggests that Leonard was able to strangle the victim by wrapping the ligature completely around the victim's neck. There is, however, little physical evidence of injury to the victim that suggests that he struggled with Leonard. There was some recent bruising to the victim's head and an abrasion and small scratch on the victim's forehead. The bruising to the victim's head was the result of an injury that was possibly sufficient to stun the victim or even cause uncon-

sciousness. The injuries to the victim could indicate that Leonard used force to preclude resistance by the victim before strangling him.

Finally, it took approximately four minutes for the victim to die by strangulation. This court has previously indicated that the length of time involved in a ligature strangulation supports an inference that a killing is willful, deliberate, and premeditated. *See Leonard v. State,* 114 Nev. 1196, 1210-11, 969 P.2d 288, 297 (1998), *cert. denied,* 528 U.S. 828 (1999). While a ligature strangulation may not always evidence a premeditated and deliberate murder, the character of killing by such means provides some evidence that may support an inference of premeditation and deliberation. *See People v. Lucero,* 750 P.2d 1342, 1349 (Cal. 1988). We hold that the time involved in the instant strangulation murder was a fact that the jury could legitimately consider, in conjunction with other facts, to support an inference of premeditation and deliberation.[16]

In sum, we conclude that the use of a ligature in the killing, the particular ligature employed here, the evidence of other injury to the victim and the absence of defensive injuries, and the length of time involved in the strangulation are all factors on which the jury could reasonably rely in concluding that Leonard committed a willful, deliberate, and premeditated killing.

### *Robbery, felony murder, and the robbery aggravating circumstance*

Leonard argues that robbery requires a live victim. If the victim is deceased, Leonard argues that there must be evidence "that the defendant intended to use force prior to the robbery and that the robbery was not incidental to the killing." He further claims that the jury was not properly instructed concerning these issues. We disagree.

The jury need not be instructed that robbery requires intent to take property from a living person. *See Leonard,* 114 Nev. at 1208, 969 P.2d at 296; *see also Chappell v. State,* 114 Nev. 1403, 1408, 972 P.2d 838, 841 (1998), *cert. denied,* 528 U.S. 853 (1999). Pursuant to Nevada's robbery statute, NRS 200.380, "it

---

[16]While courts disagree on the weight to be accorded the time involved in a strangulation killing, some courts have accorded it great significance. *See, e.g., Hounshell v. State,* 486 A.2d 789, 795 (Md. Ct. Spec. App. 1985) (indicating that the time necessary to commit a killing by strangulation affords a perpetrator "a significant opportunity for reflection and a change of heart").

is irrelevant when the intent to steal the property is formed,'' and it is not necessary that force or violence involved in the robbery ''be committed with the specific intent to commit robbery.'' *Chappell,* 114 Nev. at 1408, 972 P.2d at 841. Rather, a robbery may be shown where a defendant simply takes '' 'advantage of the terrifying situation [he or she] created' '' and flees with the victim's property. *Id.* (quoting *Norman v. Sheriff,* 92 Nev. 695, 697, 558 P.2d 541, 542-43 (1976)).

Given the relevant legal standards, we are not persuaded that the jury received any incorrect instruction that worked to Leonard's detriment.[17] Further, there is sufficient evidence, if viewed in the light most favorable to the prosecution, from which a rational juror could infer that Leonard killed the victim and stole his property. *See Koza v. State,* 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (stating review standard for sufficiency of evidence). The victim's body was found partially nude under Leonard's bed, and the evidence shows that Leonard killed him. Leonard was in possession of the victim's pager when he was arrested. Further, he gave a broken necklace to Gladys Burton that was similar to a necklace commonly worn by the victim. The jury could reasonably infer that this property had been in the victim's possession and that Leonard took it during the events leading up to or following commission of the murder.

Further, the jury was properly instructed concerning the robbery aggravating circumstance and felony murder under a robbery theory, and we conclude that sufficient evidence supports both the aggravating circumstance and the felony murder theory. The jury was properly instructed that felony murder required a showing that the killing occurred in the perpetration or attempted perpetration of a robbery.

## XI. *Remaining jury instructions*

Leonard also challenges the following guilt phase instructions:

---

[17]We note, however, that the jury received one instruction providing that ''[a] robbery occurs when the use of force follows the actual taking of property, so long as the use of force is accompanied by the intent to take another's property.'' This instruction suggests that the intent to steal must be formed at the time that force is used, which is unnecessary under Nevada law. It appears to be taken from an Arizona case quoted in a parenthetical in *Abeyta v. State,* 113 Nev. 1070, 1078, 944 P.2d 849, 854 (1997).

The instruction did not work to Leonard's detriment. Further, we note that the jury received another instruction that more accurately stated Nevada law: ''[A]lthough acts of violence and intimidation preceded the actual taking of the property and may have been primarily intended for another purpose, it is enough to support the charge of robbery when a person takes the property by taking advantage of the terrifying situation he created.''

(1) the jurors need not agree on a theory of a liability (jury unanimity); (2) equal and exact justice; (3) reasonable doubt; and (4) malice. Further, Leonard challenges the following penalty phase instructions: (1) reasonable doubt; (2) anti-sympathy; and (3) the Pardons Board's ability to commute a sentence. The reasonable doubt instructions used in this case were consistent with NRS 175.211(1).

*Jury unanimity, equal and exact justice, and reasonable doubt*

It appears that Leonard failed to preserve for appeal the issues of the jury unanimity, equal and exact justice, and reasonable doubt instructions. In any case, we do not find any error in these instructions, let alone plain error. *See Leonard,* 114 Nev. at 1209, 969 P.2d at 296-97 (discussing jury unanimity and upholding instruction on equal and exact justice); *Bollinger v. State,* 111 Nev. 1110, 1115 & n.2, 901 P.2d 671, 674 & n.2 (1995) (holding that language in reasonable doubt instruction, while not ideal, was not unconstitutional where the jury received additional instruction on the State's burden of proof and the presumption of innocence); *see also Elvik v. State,* 114 Nev. 883, 897-98, 965 P.2d 281, 290-91 (1998); *Bolin v. State,* 114 Nev. 503, 529-30, 960 P.2d 784, 801 (1998), *cert. denied,* 525 U.S. 1179 (1999).

*Malice (guilt phase)*

Leonard makes two primary claims challenging the malice instructions.

·First, Leonard claims that the implied malice instruction created an unconstitutional presumption that improperly shifted the burden of proof. The instruction provided, ''Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.'' The instruction is nearly identical to NRS 200.020(2); the instruction differs only in that it uses the word ''may'' instead of ''shall.'' This court recently held that substitution of the word ''may'' for ''shall'' in the instruction is not only permissible, but preferable. *Cordova v. State,* 116 Nev. 664, 666-67, 6 P.3d 481, 482-83 (2000). This court observed that use of ''may'' in the instruction ''eliminates the issue of a mandatory presumption.'' *Id.* at 666, 6 P.3d at 483.

Second, Leonard also claims that the instructions were insufficient to define malice. Leonard specifically asserts that the implied malice instruction contains language ''so vague and pejorative that [it] is meaningless without further definition, and it

should have been eliminated in favor of less archaic terms which define the conscious disregard for life from which malice may be implied." Leonard notes that the California Supreme Court has criticized similar language defining implied malice in California's own statute. *See, e.g., People v. Phillips,* 414 P.2d 353, 363-64 (Cal. 1966), *overruled on other grounds by People v. Flood,* 957 P.2d 869, 882 n.12 (Cal. 1998); Cal. Penal Code § 188 (West 1999).

However, the statutory language is well established in Nevada, and we conclude that the malice instructions as a whole were sufficient. This court has characterized the statutory language "abandoned and malignant heart" as "archaic but essential." *Keys v. State,* 104 Nev. 736, 740, 766 P.2d 270, 272 (1988). This court held that similar instructions "accurately informed the jury of the distinction between express malice and implied malice." *Guy v. State,* 108 Nev. 770, 777 & n.2, 839 P.2d 578, 582-83 & n.2 (1992). Further, this court has held that language in the malice aforethought instruction is constitutional that refers to "a heart fatally bent on mischief" and acts done "in contradistinction to accident or mischance." *See Leonard,* 114 Nev. at 1208, 969 P.2d at 296. This court concluded that "[a]lthough these phrases are not common in today's general parlance, . . . their use did not deprive appellant of a fair trial." *Id.* Absent some indication that the jury was confused by the malice instructions (including the instruction on malice aforethought and express malice), a defendant's claim that the instructions were confusing is merely "speculative." *See Guy,* 108 Nev. at 777, 839 P.2d at 583. Leonard has not shown that the jury was confused in the instant case.

*Anti-sympathy (penalty phase)*

Leonard challenges the instruction that the jury's verdict "may never be influenced by sympathy, prejudice or public opinion" but "should be the product of sincere judgment and sound discretion in accordance with these rules of law." This court has upheld such instruction where, as here, the jury was properly instructed to consider any mitigating evidence. *See, e.g., Wesley v. State,* 112 Nev. 503, 519, 916 P.2d 793, 803-04 (1996).

*Pardons Board (penalty phase)*

Leonard asserts that the jury was erroneously instructed about the ability of the State Board of Pardons Commissioners to modify the sentence. The jury was instructed: "Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are

instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.''

First, Leonard points out that in *Sonner v. State,* 114 Nev. 321, 955 P.2d 673, *cert. denied,* 525 U.S. 886 (1998), this court held that henceforth the jury should not be instructed regarding possible commutation. However, the primary reason for this decision was the 1995 enactment of NRS 213.085 that precluded the Pardons Board from commuting certain death sentences and sentences of life without the possibility of parole to sentences that would allow for parole. *See Sonner,* 114 Nev. at 326-27, 955 P.2d at 677. Leonard committed the instant offense in January of 1995. Thus, NRS 213.085 does not apply here. *See Miller v. Warden,* 112 Nev. 930, 921 P.2d 882 (1996) (holding that NRS 213.085(1), which took effect July 1, 1995, is unconstitutional insofar as it purports to apply retroactively). Here, the instruction correctly informed the jury that the Pardons Board has the power to commute Leonard's sentence under ''certain circumstances.''

Second, Leonard claims that the language is unconstitutional and misleading. Leonard relies primarily on *Geary v. State,* 112 Nev. 1434, 930 P.2d 719 (1996), *rehearing granted on other grounds,* 114 Nev. 100, 952 P.2d 431 (1998), and several federal cases. In *Geary,* this court concluded that the jury might have been misled by the Pardons Board instruction into believing that Geary could be released on parole even if he received a sentence of life without the possibility of parole. In fact, Geary would be denied parole pursuant to the relevant parole criteria even if his sentence were commuted. *Id.* at 1441-42, 930 P.2d at 724-25. Leonard argues that, like Geary, he would be denied parole even if his sentence were commuted.

*Geary* presents an ''atypical factual scenario'' that is distinguishable from the instant case. *See id.* at 1442, 930 P.2d at 725. In *Geary* ''counsel for both sides based their arguments on a presumption that [Geary] *could* qualify for parole.'' *Id.* at 1442, 930 P.2d at 724. Further, the jury was aware that Geary had a prior sentence of life without the possibility of parole commuted, and that he had been released on parole. *Id.* at 1442, 930 P.2d at 724-25. Neither of these facts is present in the instant case, nor did the prosecutor argue at the closing argument of the penalty phase that Leonard would be a future danger to the community. Accordingly, the instant case is distinguishable from *Geary* and is more analogous to this court's decision in *Sonner,* 114 Nev. at 325-26, 955 P.2d at 676, where this court rejected a similar claim for relief.

In sum, after careful consideration of Leonard's claim, we conclude that he is not entitled to relief based on the commutation instruction.

## XII. *Prosecutorial misconduct*

Leonard claims that the prosecutor committed misconduct in rebuttal closing argument at the guilt phase. A prosecutor's comments should be considered in context, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Young,* 470 U.S. 1, 11 (1985). Leonard raises four instances of alleged misconduct.

### *Issue preserved for appeal*

First, Leonard complains that the prosecutor shifted the burden of proof by suggesting that the defense had to prove that other suspects were guilty. The alleged misconduct occurred after the prosecutor commented that a trial was a search for the truth and that the jury should dig for the truth. The prosecutor then suggested that the defense had previously had the opportunity to question Jesus Cintron about a glove found in Leonard's apartment that the defense was now claiming might have belonged to him. Defense counsel objected on the ground that the defense had no burden of proof. The prosecutor immediately clarified that the defendant has constitutional rights and agreed that Leonard had "no burden." The prosecutor proceeded to explain that the jury had heard "rumor, innuendo and gossip" about Cintron and Jerry Leonard, who were not on trial in the case.

We conclude that the prosecutor's comments, when considered in context, do not warrant reversal. Here, the prosecutor was arguing that the defense had failed to substantiate claims that other individuals might have been involved in the murder. Although a prosecutor may not normally comment on a defendant's failure to present witnesses or produce evidence, in some instances the prosecutor may comment on a defendant's failure to substantiate a claim. *See Lisle v. State,* 113 Nev. 679, 706-07, 941 P.2d 459, 477 (1997), *limited on other grounds by Middleton v. State,* 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998), *cert. denied,* 528 U.S. 927 (1999). Even assuming the prosecutor's remarks were improper, her immediate clarification to the jury concerning the burden of proof remedied any impropriety by serving the function of an adequate curative instruction. Thus, any error is harmless.[18]

---

[18]Insofar as the prosecutor arguably disparaged legitimate defense tactics, we note that Leonard did not object on this basis. We further conclude that there is no error that would warrant relief notwithstanding Leonard's failure to object.

*Remaining issues (no objection below)*

Leonard did not object to the remaining three other instances of alleged prosecutorial misconduct: (1) the prosecutor improperly referred to highly inflammatory matters that were not relevant; (2) the prosecutor disparaged defense counsel; and (3) the prosecutor improperly emphasized that Leonard had invoked his Fourth Amendment rights. We conclude that these instances of alleged prosecutorial misconduct do not amount to plain error that would warrant relief notwithstanding Leonard's failure to object.

## XIII. *Prior conviction aggravating circumstance*

Leonard raises two claims challenging the use of his prior murder conviction as an aggravating circumstance. We reject these contentions.[19]

First, Leonard asserts that the prior conviction could not be used as an aggravating circumstance under the former provisions of NRS 200.033(2) because he had not been convicted of the prior offense at the time he committed the instant offense. Leonard notes that NRS 200.033(2) was amended in 1997 to clarify that a prior conviction need not have been entered at the time of the current offense, as long as it has been entered at any time before the penalty hearing on the instant offense. *See* 1997 Nev. Stat., ch. 356, § 1, at 1293. Thus, he alleges an ex post facto violation.

Leonard's claims lack merit because even prior to both the 1997 amendments and commission of the instant offense this court had interpreted NRS 200.033(2) to allow for the use of convictions that had been entered prior to the penalty phase. *Emil v. State,* 105 Nev. 858, 865, 784 P.2d 956, 960 (1989); *Gallego v. State,* 101 Nev. 782, 792-93, 711 P.2d 856, 863-64 (1985), *rev'd on other grounds by Gallego v. McDaniel,* 124 F.3d 1065 (9th Cir. 1997); *see also Calambro v. State,* 114 Nev. 106, 109-10, 952 P.2d 946, 948 (1998).

Second, Leonard claims that his prior conviction for murder is constitutionally infirm. This claim also lacks merit. Thus far, the prior conviction has been upheld.

## XIV. *Constitutionality of the death penalty*

Leonard asserts that the death penalty itself constitutes cruel and unusual punishment. Leonard also challenges Nevada's death

---

[19]The State claims that Leonard did not preserve these issues for appeal by proper objection. Nevertheless, we address these issues on the merits. Pursuant to NRS 177.055(2), this court is required to determine whether the sentence of death has been imposed under the influence of any arbitrary factor and whether the aggravating circumstances are supported by the evidence.

penalty scheme. He claims that, as written and as applied, it does not sufficiently curtail the sentencer's discretion, narrow the class of persons eligible for death, and otherwise ensure that the death penalty is not imposed in an arbitrary and capricious manner.

We reject Leonard's challenges to the death penalty and to Nevada's death penalty scheme. This court has repeatedly upheld Nevada's death penalty against similar challenges. *See, e.g., Middleton,* 114 Nev. at 1116-17, 968 P.2d at 314-15; *Colwell v. State,* 112 Nev. 807, 814-15, 919 P.2d 403, 407-08 (1996); *Ybarra v. State,* 100 Nev. 167, 173-76, 679 P.2d 797, 801-03 (1984); *Deutscher v. State,* 95 Nev. 669, 676-77, 601 P.2d 407, 412 (1979); *Bishop v. State,* 95 Nev. 511, 517-18, 597 P.2d 273, 276-77 (1979). We conclude that Nevada's death penalty continues to withstand scrutiny. Further, we are not persuaded that the aggravating circumstances in this case are unconstitutional.

## XV. *Speedy trial*

Leonard claims that he was denied his right to a speedy trial. In considering this issue, it is necessary to consider the following factors: (1) the length of the delay; (2) the reason for delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530 (1972). We conclude that Leonard has not demonstrated error under this test.

Although the length of the delay is not insignificant,[20] the other three factors militate against a determination that Leonard was denied his right to a speedy trial. First, the reasons for most of the delay do not appear to be the fault of the State or the court. For example, significant delay resulted from the replacement of defense counsel after Leonard's original counsel withdrew. Many other delays occurred as the result of defense counsel's actions or specific request. Second, Leonard's counsel did not raise the speedy trial issue in the district court.[21] Third, and finally, Leonard has failed to demonstrate prejudice. Leonard has not shown, for example, that any defense "witnesses died or otherwise became unavailable owing to the delay." *Id.* at 534. Accordingly, we conclude that Leonard was not denied his right to a speedy trial.

---

[20]Leonard's first trial commenced more than two years after he was arrested. The second trial commenced approximately seven months later, and the third trial commenced approximately one year after the second.

[21]We recognize that Leonard personally complained to the court on at least one occasion about the delay in the case. At that time, the court explained the reason for the delay, emphasizing the need to ensure sufficient time for defense counsel to prepare.

## XVI. *Anti-gratuity statute*

Although he did not raise the issue below, Leonard now claims that the State paid Jesus Cintron for his testimony in violation of 18 U.S.C. § 201(c)(2). The statute provides, in pertinent part, for criminal sanctions in cases where someone ''directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court.'' Leonard argues that exclusion of Cintron's testimony is the appropriate remedy for a violation of the statute. We conclude that there was no error in admitting Cintron's testimony, let alone any plain error that would warrant reversal notwithstanding Leonard's failure to object.

Preliminarily, we note that the assistance given to Cintron in this case was arguably provided for reasons other than his testimony. Here, Cintron received money for relocation expenses from the victim/witness assistance center of the district attorney's office, and he received $1,000 from the Secret Witness Program of the Las Vegas Metropolitan Police Department. The Secret Witness money was arguably provided because of Cintron's assistance in the police investigation, and the relocation expenses were unequivocally provided because Cintron felt threatened.

In any case, Leonard's position that Cintron's testimony should have been excluded is at odds with persuasive authority. At the federal level, several courts have held that the provisions do not apply to the United States or to assistant U.S. attorneys, at least where such officials are exercising the traditional sovereign power. *See, e.g., United States v. Stephenson,* 183 F.3d 110, 118 (2d Cir. 1999), *cert. denied,* 528 U.S. 1013 (1999); *United States v. Singleton,* 165 F.3d 1297, 1298-1302 (10th Cir. 1999), *cert. denied,* 527 U.S. 1024 (1999). We are similarly persuaded that the statute should not apply to the type of assistance afforded by the State in the instant case. Even assuming that the State is not exempt from the statute's provisions for the assistance rendered here, the remedy of exclusion is unwarranted given the absence of either statutory provision for such a remedy or a constitutional violation. *See United States v. Smith,* 196 F.3d 1034, 1040 (9th Cir. 1999) (concluding that the remedy of exclusion is not warranted assuming *arguendo* government violation of 18 U.S.C. § 201(c)(2)), *cert. denied,* 529 U.S. 1028 (2000); *United States v. Ware,* 161 F.3d 414, 424-25 (6th Cir. 1998) (similar), *cert. denied,* 526 U.S. 1045 (1999).

## XVII. *Remaining claims*

Leonard makes several other claims that he did not properly preserve for appeal: (1) the district court should have held a hearing to resolve a temporary conflict between Leonard's counsel and co-counsel, which was subsequently resolved; (2) the district attorney's office should have been disqualified from prosecuting this case; (3) prospective jurors were improperly excused for cause based on their religious beliefs; (4) the police illegally searched Leonard's apartment, resulting in the discovery of the victim's body; (5) the State improperly elicited evidence that Leonard had exercised his Fourth Amendment rights; (6) the State improperly elicited evidence that Leonard had been confined at the jail; (7) the State introduced unfounded evidence of witness fear and intimidation; (8) Leonard has been denied meaningful appellate review because some proceedings were not recorded; and (9) his counsel was ineffective as a matter of law at the penalty phase.

We have reviewed each of these claims and conclude that the existing record does not reveal any plain error that would warrant relief at this juncture. We reiterate that it is inappropriate to address Leonard's assertions of ineffective assistance of counsel at this time.

## XVIII. *Mandatory review*

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

We have already discussed the validity of the aggravating circumstances in this case. We now conclude, after an independent review of the record, that the death penalty was not the product of passion, prejudice, or any arbitrary factor. Nor is the death penalty excessive under the circumstances of this case. There is no compelling evidence in mitigation. Moreover, Leonard is a violent, dangerous individual, as evidenced by the fact that the instant offense is his second strangulation murder.

## CONCLUSION

For the reasons cited above and after considering whether cumulative error warrants reversal in this case, we conclude that

Leonard is not entitled to relief. We affirm Leonard's conviction and sentence of death.[22]

SHEARING, AGOSTI and LEAVITT, JJ., concur.

MAUPIN, C. J., concurring and dissenting:

I agree that Leonard's conviction should be affirmed, however, I agree with ROSE, J., that this matter should be remanded for a new sentencing hearing.

Our criminal code enumerates four possible penalties for persons found guilty of murder in the first degree: death, imprisonment for life without the possibility of parole, imprisonment for life with the possibility of parole, or imprisonment for fifty years.[1] A jury may not impose the death penalty unless it unanimously finds beyond a reasonable doubt that at least one statutory aggravating circumstance has been proved, and finds that any mitigating circumstance in the case fails to outweigh any aggravating circumstance(s).[2] Even when the circumstances of the case satisfy the prerequisites for the death penalty, a jury may still decline to impose it.[3] Because our statutory sentencing construct requires the jury to weigh the ultimate punishment for first degree murder in a different manner from the other possible sentences, the district court erred, in my view inadvertently, by implying or stating directly in several instances that the jury should weigh the sentences equally.

The improper standard first appeared in the jury questionnaire: "In your present state of mind, can you, if selected as a juror, consider *equally* all three [sic] possible forms of punishment and select the one that you feel is the most appropriate depending on the facts and the law?" While our law does not contemplate equal consideration, the questionnaire implies that it does.

More references to equal consideration of the sentences occurred during voir dire examination of the prospective jurors. By way of example, the prosecutor and defense counsel asked several of the prospective jurors if they could "give equal consideration" to the possible sentences. Also, in excusing at least two prospective jurors, the district court specifically stated that it was doing so based upon their inability to equally consider all three forms of punishment. Finally, the district court's preliminary comments to the second panel of prospective jurors explained:

---

[22]THE HONORABLE NANCY A. BECKER, Justice, voluntarily recused herself from participation in the decision of this appeal.

[1]NRS 200.030(4).

[2]NRS 200.030(4)(a).

[3]*See Kramer v. State,* 60 Nev. 262, 108 P.2d 304 (1940).

> I read [that] to you because as we inquire of you we will be asking you whether or not you can consider all three [sic] forms of punishment equally, because that is very important in this case.

The acquiescence between the district attorney and defense counsel that jurors must be able to consider all sentences equally, combined with the district court's comments on the matter, demonstrate that the wrong standard for excusing prospective jurors was applied in several important instances. In reaching this conclusion, I note that there is absolutely no evidence of bad faith. Further, it is evident that all concerned meant to convey that the jury give "fair" consideration to all of the potential forms of punishment in accordance with relevant jury instructions. However, even though the district court correctly instructed the jury on the death penalty process prior to the deliberations, I cannot conclude that the cumulative effect of these repeated references to equal consideration and the exclusion of juror no. 129 did not compromise the process. That Leonard's attorneys joined in creating the misconception does not alter the fact that this jury was left with the erroneous impression that the death penalty should be given equal consideration with the other possible penalties for first degree murder.

Improper exclusion of jurors violates the fundamental right to an impartial adjudicator, requiring reversal.[4] Further, the heightened degree of scrutiny required in death penalty cases compels that the process of jury selection be in strict accordance with the statutory scheme described above.

Individual misstatements regarding the role of the jury in the sentencing process do not in and of themselves require reversal. But, in my view, the cumulative effect of the comments made by all concerned necessitates reversal of this matter for a new penalty hearing.

RoSE, J., concurring and dissenting:

I respectfully dissent in part from my colleagues' opinion because I believe that the district court committed reversible error in excusing juror no. 129 for cause. Juror no. 129 was excused because the district court found that she could not consider the death penalty "equally" with the other two possible sentences. Our precedent mandates that we not only review this issue for plain error despite Leonard's failure to lodge a proper objection, but also that we reverse Leonard's conviction because the district court violated Leonard's fundamental right to an impartial jury.

---

[4]*See Gray v. Mississippi,* 481 U.S. 648, 668 (1987).

The majority first suggests that a review of the issue is not warranted in light of Leonard's failure to object because such failure "might reflect a tactical decision by counsel" or might be "an indication of [Leonard's] contemporaneous impression that the juror was biased and properly excluded." Our prior precedent, however, clearly indicates that this type of constitutional error should be fully reviewed on appeal even in the absence of a properly lodged objection. *See, e.g., Sipsas v. State,* 102 Nev. 119, 125, 716 P.2d 231, 234-35 (1986) (reversing first degree murder conviction in part because unobjected-to prosecutorial misconduct violated defendant's right to fair trial); *Sullivan v. State,* 115 Nev. 383, 387-88 n.3, 990 P.2d 1258, 1260 n.3 (1999) (reviewing a prosecutor's unobjected-to comments which were contrary to a plea agreement because they may have violated defendant's due process rights); *Buff v. State,* 114 Nev. 1237, 1244 n.4, 970 P.2d 564, 568 n.4 (1998) (reviewing an unobjected-to jury instruction for plain error). In addition, this court has held that "where a life is at stake, we will consider the allegations of misconduct as if there had been compliance with the contemporaneous objection rule." *Flanagan v. State,* 104 Nev. 105, 108, 754 P.2d 836, 837 (1988) *overruled on other grounds by Moore v. Nevada,* 503 U.S. 930 (1992).

Moreover, we should be consistent in considering unobjected-to error in both criminal and civil cases. In the recent civil case of *DeJesus v. Flick,* 116 Nev. 812, 7 P.3d 459 (2000), we held that this court would review as plain error unobjected-to attorney misconduct that was so substantial that it appeared to improperly influence the verdict. If we are going to examine unobjected-to argument in a civil matter concerning the rendering of a money judgment, we should certainly examine unobjected-to error in a criminal matter where the death penalty is concerned. Thus, I believe that our precedent clearly requires that we review the district court's dismissal for cause of juror no. 129 notwithstanding Leonard's lack of objection.

The majority also opines that failure to object might have been a trial strategy of Leonard's attorney. This is sheer speculation and it is not supported by logic or the record. What beneficial purpose would be served by letting a prospective juror, reluctant to assess the death penalty, be excused for cause? Instead, the record establishes that this case was tried from beginning to end on the mistaken belief that each juror had to be able to consider each potential penalty equally. The erroneous standard was printed in the prospective juror's questionnaire, both the prosecutor and defense counsel continuously repeated it in voir dire, it was emphatically stated by the district court judge during voir dire, the prosecutor challenged juror no. 129 because she could

not consider each penalty equally, the district court judge dismissed juror no. 129 for this reason, and the defense attorney did not try to traverse the challenge to juror no. 129 because he likely believed the decision was proper. Thus, the dismissal of juror no. 129 occurred because all participants in the trial had an incorrect understanding of a fundamental rule of law, and not because of some fanciful strategy of the defense.

The majority next concludes that even upon a review of the issue, Leonard has not demonstrated plain error. I disagree. It is well settled that a prospective juror in a death penalty case must be able to consider each penalty available before being qualified to sit as a juror. *See Adams v. Texas,* 448 U.S. 38, 45 (1980); *Walker v. State,* 113 Nev. 853, 866, 944 P.2d 762, 770-71 (1997); *Milligan v. State,* 101 Nev. 627, 632, 708 P.2d 289, 292-93 (1985) (applying *Adams* in a Nevada death penalty case). The defendant's constitutional right to an impartial jury, however, demands that this principle not be used to empanel a jury overly prone toward the death penalty. Thus, the rule is more precisely stated: "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams,* 448 U.S. at 45. Importantly, there is no requirement that a potential juror be able to consider each sentence "equally," as the jury here was instructed, and the requirement simply misstates the law. As the majority has concluded, this instruction must not be included in future jury voir dires or questionnaires.

In this case, juror no. 129 indicated that she could consider each penalty, but that she believed the death penalty was appropriate in only a few cases. She further indicated that she would be more inclined to choose the other penalties available that involved substantial jail time. By stating that the death penalty should be reserved only for rare offenders and that death was not her preferred form of punishment, juror no. 129 did not manifest any belief that would "prevent or substantially impair" her sworn duty as a juror, but rather demonstrated that she had a better understanding of sentencing law than those jurors who affirmatively indicated that they could consider the sentences "equally" and were *not* disqualified. As the majority itself recognizes, "the death penalty is reserved for a limited class of offenders" and need not ever be applied by the jury. Therefore, I cannot agree with the majority's conclusion that Leonard has not shown plain error where an impermissible question was asked of a juror and where the juror's response indicated that she merely had a conscious and emotional concern about the death penalty. *See Adams,* 448 U.S. at 49 (jurors cannot be excluded simply because they

indicated that the "potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally"). I believe that the district court clearly violated *Adams* by excusing juror no. 129 for cause.

This error in excusing juror no. 129 for cause violates Leonard's constitutional right to an impartial jury, a right "so basic to a fair trial that [its] infraction can never be treated as harmless error." *Gray v. Mississippi,* 481 U.S. 648, 668 (1987) (holding that an impermissible exclusion of a juror is not subject to harmless-error analysis (quoting *Chapman v. California,* 386 U.S. 18, 23 (1967))). Accordingly, Leonard's sentence must be reversed and the matter remanded for a new penalty hearing.